[Crim. No. 5288. Second Dist., Div. Three. Aug. 17, 1955.]

THE PEOPLE, Respondent, v. ARTHUR BAIRD, Appellant.

110

Eugene V. McPherson for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Chief Assistant Attorney General, and John S. McInerny, Deputy Attorney General, for Respondent.

WOOD (Parker), Acting P. J.—Defendant was charged with grand theft in that on or about September 28, 1953, he unlawfully took $3,000 from Vladimir Weinstein. Defendant admitted allegations of the information that he had been convicted previously of two felonies (forgery and arson). In a trial by jury, defendant was found guilty as charged. He appeals from the judgment.

Appellant contends that the evidence is insufficient to support the judgment; and that the court's rulings upon certain objections were erroneous.

In 1953, appellant operated a salvage business under the name of Compton Surplus and Salvage Company. Surplus property of the Marine Corps was for sale by the disposal section of the Marine Supply (hereinafter referred to as the Marine Corps). About August 10, 1953, the Marine Corps in San Francisco requested bids on 37,876 steel chests that were used for machine-gun ammunition. Appellant submitted a bid of 5¾ cents each for the chests—the total amount stated in his bid was $2,272.56. He attached thereto, as the required 25 per cent deposit, his personal check for $568.14. The bid, which was the only one received, was opened by the Marine Corps on September 9, 1953. The bid was forwarded

to Washington, D. C., for consideration. The check was "deposited," but was returned on account of insufficient funds. On September 22, 1953, the bank notified appellant that his funds were "short." On September 25, 1953, appellant wrote a letter to the Marine Corps in which he stated that if the Marine Corps would notify him that he was the successful bidder for the chests, he would forward payment in full by money order. In reply thereto, the Marine Corps wrote a letter to appellant in which it stated that appellant's bid was still under consideration by higher authority, and that it was advisable that a "depository check" or money order be forwarded immediately if appellant still desired to purchase the material.

On September 27, 1953, according to the testimony of Erwin G. Resnick, appellant went to Resnick's home and told him that he (appellant) had a chance to make a lot of money on war surplus machine-gun cases; he had been awarded the bid on approximately 38,000 cases at 12½ cents each; the deal had to be closed and he required money immediately; Resnick stated that he did not have any money available but he thought he could "have someone come in with us that could furnish the money"; Resnick and appellant made an appointment to meet the next day at 2:30 p. m. at the Union Bank.

The next day, September 28, Resnick told Vladimir Weinstein "about the deal." About 2:30 p. m. on that day, Resnick and Weinstein went to the Union Bank where Resnick introduced Weinstein to appellant, and the three of them had a conversation.

Weinstein, called as a witness by the People, testified that Resnick said in the conversation that appellant had bought some ammunition chests from the Marine Corps and that that day, September 28, was the last day appellant had to "put in the balance of the money"; appellant showed Weinstein a "form" which was like Exhibit 5 (the original bid which the Marine Corps received from appellant); the quantity of chests shown on that form was the same as shown on Exhibit 5 (37,876), but the price per unit shown on said form was 12½ cents, and the total amount shown thereon was $4,734.50; appellant told Weinstein that said total amount was the amount he had to pay for the lot of chests; appellant stated that he had invested $2,408.22 in the deal and that the balance to be paid was $2,327.28, which amount had to be paid that day (September 28) or he would lose the money he had invested; appellant asked Weinstein to invest $3,000, and

stated that the chests could be sold as junk for $20 a ton; he also stated that the transportation to Los Angeles would be $12,600; he also stated that the total expenses including cost of the chests would be about $12,000, and "the sales" which would be made would be between $15,000 and $18,000; Resnick or appellant stated that, from the first money realized from the sale of the goods, appellant would return the $3,000 plus $1,000 profit to Weinstein; Weinstein replied that he would rather have a joint venture and invest the $3,000, and then whatever profit or loss was realized would be divided equally among the three of them; appellant and Resnick said that that was "all right"; Weinstein then wrote a check for $3,000 payable to appellant's company; appellant deposited the check to the account of his company, and then caused the bank to issue a certified check for $2,327.28; he mailed the check to the Marine Corps; it was understood that the balance of the $3,000 would be used to begin transportation of the chests; the three men then went to appellant's place of business where they discussed the transportation; then Weinstein, in the presence of appellant and Resnick, made notes of certain points of their agreement; he read the notes to appellant and Resnick, and they said it was all right for him to give the notes to his attorney for use in preparing an agreement; he obtained a copy of the bid from appellant and later returned it; he believed it was the same copy of the bid which he had seen at the bank, and that his notes show that the total amount which appeared on said bid was $4,734.50; his notes also show that appellant stated he had invested $2,408.22; on October 5 appellant told them that he had not heard anything from the Marine Corps; Weinstein then gave appellant and Resnick a copy of the agreement which his attorney had prepared; appellant stated that he could not sign the agreement without consulting his attorney.

On October 6 appellant wrote a letter to the Marine Corps in which he asked when he could get the chests. On October 9 the Marine Corps wrote a letter to appellant's company in which it was stated that the bid had been rejected "as being too low," that a refund would be made, and that the chests would be readvertised at a later date. Thereafter appellant received a check from the United States Treasurer, dated October 7, 1953, for $1,974.28, which represented the difference between $2,327.28, the amount of the check mailed by appellant on September 28, and $353, being an amount which was held as a deposit by the Marine Corps on a bid

which appellant had made on other material not involved here. On October 14 appellant cashed said refund check, deposited $30, took approximately $1,400 "in bills," and purchased a cashier's check for $544.46 payable to the United States Treasurer. (Later appellant sent the check for $544.46 to the Marine Corps as a deposit on a new bid on the same chests.) On October 14, the day he cashed the refund check, appellant, Weinstein and Resnick had a meeting, and appellant told Weinstein and Resnick that the bid had been rejected. Resnick testified that appellant stated that new invitations to bid were going out and that he had left all the money in San Francisco to go on the new bid. Weinstein testified that he told appellant at that meeting that he did not want "to go any further on this joint venture," and he would like to have his money returned; appellant stated that he would not return the money—that it would be left for full payment of the new bid; Weinstein then told appellant that he should at least increase his bid from 12½ cents to 13 or 13½ cents (each); appellant stated that he knew his business and that he would bid the same amount, and that if Weinstein did not "want it" he would return his money but he could not return it at that time—he would do so within 10 day or two weeks. On October 15 the Marine Corps returned all the monetary assets to appellant which it held for appellant's account, and rejected his "bids."

About October 15 appellant was convicted of the crime of arson. On October 26 Weinstein talked with appellant, in the county jail, and told him that he intended to prosecute him unless he returned the $3,000. Appellant did not return any part of the money. Weinstein testified that he would not have written the check for $3,000 if he had known that appellant had not purchased the chests or had not invested $2,408.22 in the chests, or if he had known that appellant had bid 5¾ cents instead of 12½ cents.

Appellant testified, in part, that he told Resnick that he bid 5¾ cents each for the chests, and that the total price would be 12½ cents per unit by the time they arrived in his yard; he also told Resnick that he was satisfied that his bid had been accepted because the government never cashes checks except those of the successful bidder; he told Resnick that if he wanted to come in as a partner he could do so; when Resnick and Weinstein met him on September 28, Resnick stated that Weinstein wanted to lend $3,000; appellant told Resnick that it made no difference to him where he got the

114

money; Resnick then told appellant (out of Weinstein's presence) that Weinstein would like to come in as a third partner, and appellant replied that he was not looking for a third partner—that he was willing to have Resnick as a partner but that he wanted no part of a three-way partnership; he deposited Weinstein's $3,000 check; Resnick gave him the $3,000 for one-half partnership in his business.

With reference to appellant's contention that the evidence is insufficient to support the judgment, he argues in substance that there was no criminal intent at the time he received the $3,000; he deposited the money in his company's bank account and mailed a certified check for $2,327.28 to the Marine Corps with the knowledge and consent of Weinstein; and if the bid had been accepted and the money used to pay for the chests no criminal prosecution could have resulted. ■ As above shown there was evidence that appellant made false representations regarding material facts at the time of the transaction with Weinstein. There was testimony that appellant told Resnick that he had been awarded the bid for the chests, and Resnick repeated that statement to Weinstein in appellant's presence; appellant told Resnick and Weinstein that he had to pay a total of $4,734.50 for the chests, and that he had invested $2,408.22 in the deal; appellant showed a purported copy of the bid to Weinstein, wherein the bid was shown as 12½ cents per chest and $4,734.50 for all of the chests. Appellant had no money invested in the chests—the check for $568.14 which he sent as a deposit was returned to the Marine Corps because appellant did not have sufficient funds in the bank. The bid which the Marine Corps received was 5¾ cents per chest and a total of $2,272.56 for all of the chests. The check for $2,327.28, which was mailed September 28, was for an amount in excess of the total amount bid for all the chests. The evidence was sufficient to support a finding that appellant was guilty of grand theft in that he obtained money by false pretenses. ■ "The elements of the crime of grand theft on the theory of obtaining money by false pretenses are: (1) An intent to defraud; (2) an actual fraud committed; (3) the use of false pretenses to perpetrate the fraud; and (4) reliance upon the fraudulent representations in parting with the money or other property." (*People* v. *Nesseth,* 127 Cal.App.2d 712, 715 [274 P.2d 479].) ■ Whether appellant obtained the money with intent to defraud was a question of fact to be determined from the evidence of the entire transaction. (*People* v. *Post,* 76 Cal.App.2d 511, 514

[173 P.2d 48].) The evidence was sufficient to prove that appellant obtained the money with intent to defraud; and was sufficient to prove the other elements of grand theft. The evidence supports the judgment.

Appellant also contends that the court erred in permitting Weinstein, over the objection of appellant, to use a memorandum while testifying. On cross-examination, when Weinstein referred to certain meetings he had with appellant, counsel for appellant asked him if he was testifying from notes. Weinstein replied in the affirmative, and said further that the notes were typed after the preliminary examination (held on March 23, 1954) and were a compilation or summary of his original notes which he had made on other occasions as the incidents occurred; and that his original notes were underneath the summary of his original notes. He also testified that he did not make any notes as to what was said in the conversations with appellant at the bank or at his place of business on September 28, or as to what was said in the conversation at his place of business on October 5; and that the summary was a memorandum as to dates and was not a memorandum as to ''the contents'' of conversations. Appellant objected to the use of the notes which were referred to as a summary of the original notes. The objection was overruled. On direct examination, when Weinstein was testifying regarding the meeting at the bank on September 28, the deputy district attorney asked him what was said about price. Thereupon appellant's counsel said that the witness was reading from notes, and that appellant objected thereto. The court asked the deputy district attorney to lay the foundation for the use of the notes. Then, in answer to questions by the deputy, Weinstein said that some of the notes were made at the time of the conversation and that some of the notes were a condensation of notes he had made at the time of the transaction on September 28, or a few days later. He also said that the figures which were on one of the papers were put thereon in October, 1953. The trial court ruled that a proper foundation had been laid for the use of the memorandum. Section 2047 of the Code of Civil Procedure provides: ''A witness is allowed to refresh his memory respecting a fact, by anything written by himself, or under his direction, at the time when the fact occurred, or immediately thereafter, or at any other time when the fact was fresh in his memory, and he knew that the same was correctly stated in the writing. . . .'' It appears that the witness used the

summary of his original notes to refresh his memory as to dates, places and figures, and to facilitate the use of his original notes which were underneath or attached to the summary. Appellant does not contend on appeal that the original notes were not a proper memorandum for use in refreshing memory. The court did not err in overruling the objection.

Appellant also contends that the court erred in sustaining an objection to appellant's offer in evidence of a letter which was sent by appellant to Resnick in January, 1954. During the direct examination of appellant, he was asked if he had contacted Resnick after he (appellant) was released from jail on December 15. The deputy district attorney objected "to anything further after the taking of the money." Appellant's counsel argued that the question pertained to the partnership between appellant and Resnick. The objection was sustained. Thereupon appellant's counsel offered in evidence the letter above referred to (from appellant to Resnick). Appellant's counsel stated that the letter was offered to show that appellant, after he was released from jail, offered to go ahead with the partnership with Resnick. The deputy district attorney objected to the offer on the ground that the letter did not pertain to Weinstein. The objection was sustained. It appears that the letter did not pertain to Weinstein, and that it was written about three months after Weinstein had given the money to appellant and after Weinstein had told appellant that he intended to prosecute him. It was not error to sustain the objection to the offer.

The judgment is affirmed.

Vallée, J., and Ashburn, J. pro tem.,* concurred.

---

*Assigned by Chairman of Judicial Council.