[Crim. Nos. 6253, 6254. Second Dist., Div. Two. Dec. 16, 1959.]

THE PEOPLE, Respondent, v. HENRY J. CARUSO et al., Defendants; CARL R. BUCKNER, Appellant.

[Two Cases.]

Gordon B. Friesen and Joseph A. Ball for Appellant.

Stanley Mosk, Attorney General, and Elizabeth Miller, Deputy Attorney General, for Respondent.

HERNDON, J.—Appellant Buckner and a number of other individuals were indicted on some 43 counts, charging forgery and grand theft, and conspiracy to commit forgery and grand theft in connection with sales of automobiles. Appellant pleaded not guilty to all eight counts charged against him and he and and his counsel waived trial by jury. At the trial four of the charges were dismissed. Of the remaining four counts, appellant was found not guilty as to two (grand theft—Gonzales transaction, and forgery — Tucker transaction) and guilty as to the remaining two (grand theft—Tucker transaction; grand theft—Mucci transaction). Proceedings were

suspended and appellant received five years probation on condition that he spend six months in the county jail, pay a fine of $1,000 and stay out of the automobile business.

This appeal is taken from the order denying Buckner's motion for a new trial and from the order granting his application for probation. The major contention here urged is that the evidence was insufficient to support the judgment on either count.

Our review of the evidence will be governed by the familiar rule of *People* v. *Newland,* 15 Cal.2d 678 [104 P.2d 778]. ██ We must assume in favor of the judgment the existence of every fact reasonably deducible from the evidence. ██ Before the judgment may be set aside, it must appear that upon no hypothesis whatever is there sufficient evidence to support the conclusion reached in the court below. (*People* v. *Newland, supra,* at 681.) ██ It is the trier of fact, and not this court, which must be persuaded beyond a reasonable doubt of the guilt of the defendant. (*People* v. *Smith,* 35 Cal.App.2d 73, 76 [94 P.2d 633]; *People* v. *Dragoo,* 121 Cal.App.2d 322, 324 [263 P.2d 90], and cases cited therein. See also *People* v. *Rankin,* 160 Cal.App.2d 93, 100-101 [325 P.2d 10]; *People* v. *Bahara,* 159 Cal.App.2d 160 [323 P.2d 453].)

██ Obtaining property by false pretenses is the fraudulent or deceitful acquisition of title and possession. (*People* v. *Ashley,* 42 Cal.2d 246, 258 [267 P.2d 271].) ██ The elements of the crime of grand theft on the theory of obtaining money by false pretenses are: (1) an intent to defraud; (2) an actual fraud committed; (3) the use of false pretenses to perpetrate the fraud; and (4) reliance upon the fraudulent representations in parting with money or other property. (*People* v. *Frankfort,* 114 Cal.App.2d 680, 697 [251 P.2d 401]; *People* v. *Nesseth,* 127 Cal.App.2d 712, 715 [274 P.2d 479]; *People* v. *Baird,* 135 Cal.App..2d 109, 114 [286 P.2d 832].) ██ A single false material misrepresentation is sufficient to constitute the offense, if the other essential elements are proved. (*People* v. *Cravens,* 79 Cal.App.2d 658, 664 [180 P.2d 453]; *People* v. *Martin,* 153 Cal.App.2d 275, 286 [314 P.2d 493].) ██ A promise made with an existing intent not to perform may constitute a false pretense within the grand theft statute. (*People* v. *Gilliam,* 141 Cal.App.2d 749, 754 [297 P.2d 468]; *People* v. *Hodges,* 153 Cal.App.2d 788, 792 [315 P.2d 38].)

Reviewing the voluminous transcript in the light of the *Newland* rule, it is our conclusion that appellant's contention is untenable and that the evidence is sufficient as to all ele-

ments of the offense charged to support the convictions on both counts. Since the two counts related to separate transactions with different persons, for clarity they will be separately discussed.

1. *The Tucker Transaction.*

Viewing the evidence in the light most favorable to respondent the facts were as follows: On March 16, 1957, while in Pasadena visiting friends, the Tuckers saw a television commercial advertising a "good trade-in deal" at Freeway Pontiac. Mr. Tucker telephoned the company, asked a salesman what trade-in allowance would be given on his 1949 Cadillac and he was told that $1,095 to $1,395 would be allowed. The Tuckers drove to Freeway Pontiac, parked their car and began looking at the cars on the lot. Mr. Tucker told the salesman that the only extra equipment he wanted was an automatic shift, a radio and a heater. The salesman told them that the allowance on their Cadillac would be $1,295. The Tuckers selected a two-door Pontiac which, they were told, was priced at $2,919 on a "special deal."

The Tuckers were taken into a small office where they were introduced to appellant, who, they were told, was the sales manager. Appellant also told the Tuckers that the full price of the Pontiac was $2,919 and that they would be given a trade-in allowance of $1,295 on their car. He further told the Tuckers that the numerous "extras" on the car were priced at one dollar each.

The Tuckers told appellant that they did not feel they could assume payments of over $70 per month. Appellant made numerous calculations on a sheet of paper which he subsequently threw into a wastebasket. He finally told the Tuckers that if they would obtain a $250 loan to help with their down payment, they would pay $99 per month for six months, and at that time their payments would automatically drop to $64 per month for the remaining 30 months of the conditional sales contract. Mrs. Tucker indicated that the payments for the first six months would entail a considerable financial hardship.

Appellant produced some blank papers, told the Tuckers that the stenographers were all busy and said that the particulars of the transaction would be filled in after the Tuckers signed the documents. The Tuckers signed numerous papers which, it was testified, did not contain the figure $350 as the used-car allowance, nor terms of payments of $85.77 per

month for 36 months. The understanding between the parties was that the allowance would be $1,295 and that the payments would be $99 per month for the first six months and $64 per month thereafter. The Tuckers would not have signed the papers if they had known that the allowance for their car was to be $350, and the payments for the car $85.77 per month for 36 months. The payments on the $250 loan would be $14 per month for 24 months.

Mrs. Tucker executed a power of attorney authorizing the transfer of ownership of the 1949 Cadillac. The Cadillac was left at Freeway Pontiac and the Tuckers returned to their friends' home in the 1957 Pontiac. It was at that time that they looked at the contract and noticed that the figures typed in were $350 allowance for their car, payments of $85.77 per month for 36 months, and a loan of $250. Mr. Tucker telephoned the company and told them that he wished to rescind, return the new car and get his Cadillac back. He was told that "it was [his] baby . . . [and he] had to suffer with it."

The Tuckers then consulted the district attorney's office and also a private attorney. The latter advised them to go ahead with the deal and do the best they could for the time being. They followed this advice and on March 20 Mrs. Tucker took $250 in to the company and endorsed and delivered the certificate of ownership to the Cadillac. Thereafter, they ceased making these payments and the car was repossessed on August 19, 1957.

These facts, with the inferences legitimately deducible therefrom, amply support the findings of the trial court as to all the essential elements of the crime of obtaining money or property by false pretenses. ■■■ The intent to defraud is a question of fact to be determined from all the facts and circumstances of the case. (*People* v. *Post,* 76 Cal.App.2d 511, 514 [173 P.2d 48] ; *People* v. *Frankfort, supra,* 114 Cal.App. 2d 680, 697; see Pen. Code, § 21.) It may be, and usually must be, inferred circumstantially. (*People* v. *Henderson,* 79 Cal.App.2d 94, 117-118 [179 P.2d 406].) ■■■ In the case at bar, there was evidence presented to the effect that appellant told the Tuckers that he would allow them $1,295 as a trade-in allowance for their Cadillac, that he thereafter gave them a blank purchase order and blank conditional sales contract to sign, that they signed these documents, and that he subsequently inserted the figure $350 as the amount to be allowed for the trade-in. From these facts, it may be reason-

ably inferred that appellant intended to defraud the Tuckers of the difference between $1,295 and $350, or $945.

The evidence also supports the finding that an actual fraud was committed. The Tuckers testified that they would not have signed the conditional sales contract if they had known that their trade-in allowance would be but $350. Appellant's statement that he would make an allowance of $1,295 led them to sign the contract, part with their Cadillac and bind themselves to pay $945 more than they had anticipated. (*Cf. People* v. *Nesseth, supra,* 127 Cal.App.2d 712, 715-716.)

In addition, there was substantial evidence to support the view that appellant used false pretenses to perpetrate the fraud. A "false pretense" is a representation of some fact or circumstance which is not true and which is calculated to mislead. (*People* v. *Martin, supra,* 153 Cal. App.2d 275, 285; *People* v. *Schmitt,* 155 Cal.App.2d 87, 107 [317 P.2d 673].) Appellant represented to the Tuckers that they would receive a trade-in allowance of $1,295. He asked them to sign a purchase order and conditional sales contract before the actual allowance was inserted therein. He thereafter inserted the sum of $350 as the amount of the trade-in. It seems clear that appellant's representation as to the amount which would be allowed the Tuckers was untrue and calculated to mislead them.

Finally, the evidence shows that the Tuckers relied upon the fraudulent representations of appellant in parting with their property. There was testimony to the effect that neither Mr. nor Mrs. Tucker would have signed the documents in question or parted with their Cadillac if they had known that the trade-in allowance was to be $350 instead of $1,295. It was thus reasonable to conclude that the Tuckers acted in reliance upon the appellant's misrepresentations.

Since a single false material representation is sufficient to constitute the offense of obtaining money or property by false pretenses (*People* v. *Cravens, supra,* 79 Cal.App.2d 658, 664; *People* v. *Martin, supra,* 153 Cal.App.2d 275, 286), it is unnecessary to discuss in detail the evidence concerning the alleged misrepresentations regarding the down payment loan and the amount of the monthly payments to be made by the Tuckers on the Pontiac. Suffice it to state that this evidence was also sufficient to support the judgment.

Appellant's contentions regarding custom and practice in the automobile industry do not undermine the sufficiency of

the evidence. While this evidence might have had some probative value as supporting appellant's interpretation of the transaction, the trier of fact was free to reject it or find it outweighed by other testimony. (*People* v. *Von Benson*, 38 Cal. App.2d 431, 434 [101 P.2d 527] ; *People* v. *Luchetti*, 119 Cal. 501, 505-506 [51 P. 707].)

Nor do appellant's claims regarding the inconsistencies in the testimony of the witnesses or the general credibility of Mr. Tucker alter our conclusion. The weighing and balancing of such matters is for the determination of the trier of fact, having the witnesses before it and observing their demeanor. (*People* v. *Frankfort, supra,* 114 Cal.App.2d 680, 692, 700; *People* v. *Ashley,* 42 Cal.2d 246, 266 [267 P.2d 271] ; and see *People* v. *Von Benson, supra.*)

■■■■ Appellant further urges that there was no grand theft in that it was necessary to show that tangible property was taken pursuant to the utterance of an instrument induced by false pretenses. Clearly, the Cadillac was transferred pursuant thereto. The $1,295 offered by appellant on the trade-in is some evidence of its actual value. And if the excess of its actual value over the $350 allowed on the trade-in were not in itself sufficient, it is well settled that where a promissory note or obligation to pay is obtained by the use of false representations, the note itself or other chose in action is property within the meaning of Penal Code, section 484. (*People* v. *Cassou,* 27 Cal.App. 23, 25 [148 P. 810] ; *People* v. *Frankfort, supra,* 114 Cal.App.2d 680, 703, and cases cited therein.)

The evidence in the case at bar shows that the Tuckers signed a purchase order and conditional sales contract, obligating themselves to pay sums in excess of $200. In addition, the documents signed obligated them to pay more than $200 more than they would have had to pay had the trade-in allowance or the monthly payments been that which appellant represented them to be. The obligation to pay may have been voidable, but it was not void. (*City of Oakland* v. *California Construction Co.,* 15 Cal.2d 573, 577 [104 P.2d 30] ; *Scheel* v. *Harr,* 27 Cal.App.2d 345, 352 [80 P.2d 1035].) It does not appear to be the law of California that money or other tangible property need have been paid to appellant pursuant to the contract before the offense was completed. (See *People* v. *Frankfort, supra; People* v. *Nesseth, supra,* 127 Cal.App.2d 712, 716.)

■■■■ Finally, appellant contends that the theory of grand theft and the theory of forgery relied upon by the prosecution

in the two counts charged against him regarding the Tucker transaction require identical physical acts and intent—false representation, inducement to sign a blank contract, subsequent entry of words into the contract contrary to the representation and intent to defraud. He therefore asserts that since he was acquitted by the trial court on the forgery count, this acquittal was tantamount to a finding that he did not utter a false document. If he did not utter a false document, he did not commit grand theft and, therefore, appellant urges, the findings on the two counts are inconsistent so that the conviction of grand theft must be reversed. This contention must be rejected. Regardless of any possible inconsistency in the implied findings, the acquittal on the forgery count did not compel an acquittal on the grand theft count. (Pen. Code, § 954.) It is well settled that verdicts may be sustained, even if they are inconsistent in fact. (*People* v. *Witzel*, 155 Cal. App.2d 486 [318 P.2d 136], *passim,* and cases cited therein.)

2. *The Mucci Transaction.*

The facts of this transaction, viewed in the light of the *Newland* principle, are as follows: On March 24, 1957, Mr. and Mrs. Fred Mucci went to the Freeway Pontiac Company in their 1949 Ford. They parked their car and were met at the door by a salesman who said "I will give you $700 for your car." After looking at a number of cars, the Muccis selected a two-door hydramatic Pontiac with radio and heater and were quoted a price of $2,600 complete, with their car. When asked by the salesman how much of a down payment the Muccis would give, Mr. Mucci replied that he did not have anything for a down payment on a car. The salesman said that that matter could be arranged and introduced appellant, as assistant manager, to the Muccis.

Appellant told the Muccis that their car was worth the $700 which the salesman had quoted and that they would get the deal. A contract and purchase order were prepared for the car, showing a selling price of $2,985, plus sales tax of $120, and license and transfer of $46, making a total cash price of $3,151. From this were deducted a used-car allowance of $50, cash payment of $150 and additional payment due of $300 from a loan, giving a total credit of $500, and leaving an unpaid balance of $2,651. Further charges included a total insurance premium of $100.50 and finance charges of $771.02, bringing the contract balance to $3,522.52. A special payment of $100 was due on April 10, 1957, and the remainder was

to be paid in 36 monthly installments of $95.07 beginning May 5, 1957.

Mr. Mucci noticed the $95 payment and questioned appellant about it. Appellant said to disregard it, telling him that the purpose of these papers was to obtain basic facts—name, address, etc. Appellant told the Muccis that the higher figures were not binding, that the contract was made out that way only because they were letting them leave with the Pontiac without making any cash down payment and that as soon as the Muccis brought in some money the contract would be torn up and rewritten. Mr. Mucci told appellant that he was unable to pay $95.07 per month, asked him to write down what the payments were to be per month and appellant wrote, "Pre-pay 5 months only to $75.07 customer to bring in money" in the margin. Mr. Mucci testified that he did not understand the meaning of "pre-pay." It further appeared that appellant told the Muccis that when they brought in $450 the terms of the rewritten contract would be $75 per month for the first five months and $68 per month for the balance of 31 months. The Muccis signed the order and a conditional sales contract. They transferred their 1949 Ford and left with the Pontiac.

Subsequently, the Muccis paid $450 in cash to Freeway Pontiac. They asked about having the contract rewritten and were told that they would have to speak to the original salesman or to appellant. They returned a number of times, but were unable to see either the salesman or appellant. Later, Mr. Mucci discovered what the payments to the finance company were to be and informed Freeway Pontiac that he could not make the $95 payment. He said that he either wanted the Pontiac at the price which had been quoted or he would return the car, expecting to receive back what he had given the company. He was told that he could not get his money back. Finally, an arrangement was reached, whereby Mr. Mucci returned the Pontiac and Freeway Pontiac gave him a 1949 Ford (which was in considerably worse condition than the one he had previously had). Freeway Pontiac executed a release relieving him from any obligation to the finance company and he gave them a release.

Mr. Mucci testified that he would never have signed the documents, taken the Pontiac, left his Ford and paid $450 in cash if he had known that Freeway Pontiac would not rewrite the contract and give him the car for $2,600. He further testified that the reasonable market value of the Ford

which he traded in was about $150 to $175, that the contract was never rewritten and that he never received any of his $450 cash back.

Reviewing this evidence in the light of the rule in the *Newland* case and in the light of the authorities setting forth and interpreting the elements of the crime of obtaining money or property by false pretenses, discussed *supra* in our review of the Tucker transaction, we conclude that there was ample evidence to support the conviction of grand theft in the Mucci transaction. The facts above set forth support the findings of the trier of fact to the effect that appellant had an intent to defraud the Muccis; that there was an actual fraud committed; that appellant used false pretenses to perpetrate the fraud; and that the Muccis relied upon appellant's fraudulent representations in parting with their property.

Appellant refers to certain inconsistencies and contradictions in the testimony of the Muccis. ▮ However, it was for the trier of the facts "to sift the true from the false, to determine the credibility of the witnesses and the weight to be given the testimony of an individual witness, even if it was inconsistent." (*People* v. *Ashley, supra,* 42 Cal.2d 246, 266.)

The orders presented for review are affirmed.

Fox, P. J., and Ashburn, J., concurred.

A petition for a rehearing was denied January 12, 1960, and appellant's petition for a hearing by the Supreme Court was denied February 10, 1960. White, J., did not participate therein.