[Crim. No. 3965. First Dist., Div. One. Aug. 23, 1962.]

THE PEOPLE, Plaintiff and Appellant, v. ANDREW CONLON et al., Defendants and Respondents.

Stanley Mosk, Attorney General, Arlo E. Smith, John S. McInerny, and Derald E. Granberg, Deputy Attorneys General, for Plaintiff and Appellant.

Leslie C. Gillen and Rodney H. Washburn for Defendants and Respondents.

BRAY, P. J.—The People of the State of California appeal from an order dismissing indictment.

### QUESTION PRESENTED

Did the evidence before the grand jury show probable cause that defendants conspired to commit petty theft?

### RECORD

Defendants were indicted for violation of section 182, Penal Code, in that they conspired to violate section 488 (petty theft). On arraignment defendants moved under section 995, Penal Code, to dismiss the indictment on the ground of lack of probable cause. The motion to dismiss was granted and the district attorney was instructed, pursuant to section 998, Penal Code, to resubmit the case to the grand jury or to file an information.

### THERE WAS PROBABLE CAUSE

" 'Sufficient cause' and 'reasonable and probable cause' mean such a state of facts as would lead a man of ordinary caution or prudence to believe and conscientiously entertain a strong suspicion of the guilt of the accused (*People* v. *Nagel*, 25 Cal.2d 216, 222 [153 P.2d 344]), but '[t]he proof which will authorize a magistrate in holding an accused person for trial must consist of legal, competent evidence. No other

type of evidence may be considered by the magistrate. The rules of evidence require the "production of legal evidence" and the exclusion of "whatever is not legal" (Code Civ. Proc., § 1825; . . .).' " (*Rogers* v. *Superior Court* (1955) 46 Cal.2d 3, 7-8 [291 P.2d 929].)

George Haigh was employed by the San Francisco Better Business Bureau to investigate the activities of the Publishers Continental Sales Corporation. He contacted defendant Tinker at the Fielding Hotel and was employed by him as a solicitor. Haigh was required to move into the hotel with the rest of the crew. Defendant Conlon, the field manager, assigned him to defendant Pat Sorensen's crew. Defendant Brown was designated to be his trainer. The other defendants were members of the solicitation force. At dinner the group kidded themselves about being epileptics and orphans. Haigh was told "You don't know it, but you are an epileptic."

Each morning a sales meeting was presided over by Conlon, roll was called, and Conlon would go over the sales of each person for the day before, encourage them or tell them they weren't doing too well, and give a sales talk. One of the crew posed as being an orphan from the "Beaver Boys' Home." Conlon said that it was no wonder nobody ever heard of that home because "you are the only one from Beaver." The credentials issued Haigh were stamped "Veteran," although he had told Tinker that he was not a veteran. Commenting to other solicitors about this misstatement they said it was all right, it was "just stamped on there."

Haigh accompanied defendant Brown to learn technique. At the first house a woman answered the door. Brown introduced Haigh and himself as two epileptics who had just been released from a veterans' hospital. His sales "pitch" was an extension of this approach. The same method was repeated at other houses. Brown was successful in getting some subscriptions to magazines.

Defendant Reid used the same sales "pitch" as Brown, but mentioned a different hospital or a different manner in which he became an epileptic from those stated by Brown. Brown had told Haigh what veterans' hospital to say he was from, if asked.

Haigh went soliciting subscriptions with Pat Sorensen. At Dr. Hertz' home she said that they were both orphans and were in a sort of "National Youth Opportunity Program." She said that she was from Pulaski Girls' Home in Chicago,

and that her orphan sister was blind. She said she had just turned 18 and the home would not let her out for a certain period of time, but if she could get so many votes during that period (votes given for magazine subscriptions) she would not have to go back to the orphanage. The next day Conlon instructed the crew to tell the people about the "Youth Opportunity Program."

Haigh went with other crew members. They used the epileptic "pitch." Some of the subscribers did not want the magazines and would tell the solicitors to send them to anybody the solicitors might choose. The solicitors would send them to friends or names out of the phone book. All subscriptions were sent to the magazine companies. The solicitor was paid a percentage of each subscription; another percentage was paid to the crew manager, also one to the field manager. Solicitors made from $65 to $120 per week.

A Mrs. Miller testified that defendant Deal, one of the solicitors, at her home asked her if she was afraid of an epileptic, as he was one. He said he was going to Ft. Miley Hospital to have an arm amputated. She subscribed for Coronet, giving a check payable to Conlon. The solicitor told her she could get the magazine for herself or have it sent in her name to a veterans' hospital. She chose the latter. She would not have subscribed if she had known that Deal was not an epileptic, as she was not interested in taking any magazines at that time.

Mrs. McMains was approached by defendant Freeman who said that he was an epileptic from a veterans' hospital, seeking to earn points through magazine subscriptions, so that he could prove to the hospital that he was sufficiently rehabilitated to take a job in public. He suggested that she send the magazine to the veterans' hospital at Palo Alto. She would not have subscribed had she known that the solicitor was not an epileptic.

The approach of defendant Amburgy to Mrs. Keller was similar to the approach given Mrs. McMains by defendant Freeman. She didn't want the magazine for which she subscribed, and would not have purchased it except for the fact that she thought the solicitor was an epileptic.

One Alford gave testimony similar to that of Mrs. Keller. Freeman was the solicitor. While talking, Freeman "went through various physical contortions."

Dr. Hertz' story of Pat Sorensen's obtaining a subscription from him was similar to Haigh's version of it. The doctor

would not have subscribed had he not believed Pat's story about her and Haigh's being orphans.

Although there was no direct evidence that the solicitors were neither veterans nor orphans working their way out of hospitals and orphan homes, the reasonable conclusion to be drawn from the evidence, particularly the misrepresentations as to Haigh's being an orphan and a veteran, is that there is reasonable cause to believe that the solicitors were not as represented. The evidence and the reasonable inferences therefrom show "such a state of facts as would lead a man of ordinary caution or prudence to believe and conscientiously entertain a strong suspicion" (*Rogers* v. *Superior Court, supra,* 46 Cal.2d 3, 7-8) that defendants were engaged in a conspiracy to obtain magazine subscriptions upon a false representation that the particular solicitor was an epileptic veteran just released from a veterans' hospital seeking to earn points by selling magazines which would prove that he was rehabilitated sufficiently to take a job, or was an orphan earning by such sales release from an orphan asylum. There were variations on these stories given to the persons approached to purchase subscriptions. The false stories were obviously told to arouse the sympathy of the persons approached so that they would subscribe for the magazines on the list carried by the solicitor. Moreover, it appears that in most instances the purchasers did not want to subscribe for the magazines but did so solely in the erroneous belief that by so doing they would be contributing charitably to ameliorate the plight in which the solicitors falsely represented themselves to be.

### False Pretenses

Defendants contend that as there were no misrepresentations concerning the quality, value, price or delivery of the magazines subscribed for, nor any evidence of a conspiracy to misrepresent in that respect, there could be no crime.

It is true that there is no evidence that the magazines were not delivered as ordered, nor that the price was misrepresented.

The crime charged is conspiracy to commit petty theft by false pretenses. Section 484, Penal Code, reads (so far as applicable here) : "Every person . . . who shall knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other person of money, labor or real or personal property . . . is guilty of theft." (Section 488 refers

to the degree of theft.) The crew used was an organized one, picked and trained for the specific purpose of obtaining magazine subscriptions (and the attendant commissions) by misrepresenting that they needed the subscriptions for a non-existing purpose. There was common direction, critiques, and coordinated action. A reasonable inference from the evidence is that the solicitors were neither veteran epileptics nor orphans as represented. Thus the false pretenses consisted of misrepresentation as to the status of the solicitors, made for the purpose of causing the subscribers to subscribe because of sympathy for a condition of the solicitor which did not exist, all evidencing a conspiracy to obtain subscriptions by false representations.

The necessary elements that must be shown to establish the crime of theft by false pretenses are: "(1) an intent to defraud; (2) an actual fraud committed; (3) the use of false pretenses to perpetrate the fraud; and (4) reliance upon the fraudulent representations in parting with money or other property." (*People* v. *Caruso* (1959) 176 Cal.App.2d 272, 276 [1 Cal.Rptr. 428].) There can be no question but that the evidence clearly shows all four of these elements. Defendants' main attack is on the first and second elements above set forth.

1. *Intent to Defraud.*

The intent to defraud can be inferred from all the facts and need not be proved by direct evidence. (*People* v. *Henderson* (1947) 79 Cal.App.2d 94, 118 [179 P.2d 406]; *People* v. *Caruso, supra,* 176 Cal.App.2d 272, 278.) In order to prove the intent it is necessary that the misrepresentations were made knowingly. (*People* v. *Ashley* (1954) 42 Cal.2d 246, 264 [267 P.2d 271].) It is obvious that the misrepresentations made here were knowingly made.

In those instances when Haigh, who was employed by the Better Business Bureau to get evidence, accompanied defendants Brown and Sorensen and the latter two represented him variously to be an epileptic, an orphan and a veteran, they either knew that he was not any of these, or at least they had no knowledge that he was, and knowingly made the representations. They were made with the intent to deceive the subscribers. The acts, statements and conduct of the parties " ' . . . would lead a man of ordinary caution or prudence to believe, and conscientiously entertain a strong suspicion . . .' " that defendants were not what they represented themselves to be. See *Lorenson* v. *Superior Court*

(1950) 35 Cal.2d 49, 57 [216 P.2d 859], where the court held that the grand jury could reasonably infer "from the events which transpired" the conspiracy to commit the crime charged. As there said, " '. . . "Reasonable and probable cause" may exist although there may be some room for doubt.' " (P. 57.)

It is clear that the representations were made with the intent to obtain the sympathy of the subscribers to persuade them to do something which they would not otherwise do, namely, part with money for subscriptions.

## 2. *Actual Fraud.*

▇ In the above sense there was actual fraud. The conspiracy alleged to exist here does not dissolve because the victims received value for their money, that is, that the magazines were sent to them or to their designees. The gravamen of the offense is the conspiracy to make false representations with intent to cause another to purchase magazines primarily to benefit the solicitor not by his receiving a commission but in a respect which actually did not exist. The prime purpose of the representations was to falsely persuade the purchaser that for his money he was receiving the satisfaction of doing charity towards the solicitor, as well as buying a magazine.

*Perry* v. *Superior Court* (1962) 57 Cal.2d 276, 282-283 [19 Cal.Rptr. 1, 368 P.2d 529], points out that "To support a conviction of theft for obtaining property by false pretenses, it must be shown: (1) that the defendant made a false pretense or representation, (2) that the representation was made with intent to defraud the owner of his property, and (3) that the owner was in fact defrauded in that he parted with his property in reliance upon the representation. [Citations.]"

▇ The case also holds "that the elements of an offense, herein grand theft by false representations, need not be established beyond a reasonable doubt in order to hold a defendant to answer following a preliminary examination." It is enough if " 'reasonable or probable cause' " is shown. (P. 283.) In our case the evidence shows reasonable and probable cause for believing that the false representations were made, that they were made with intent to defraud the owner of his property (money), that the owner did in fact part with his money in reliance upon the representations, and that he was in fact defrauded in that he did not get all that he bargained for, namely, the satisfaction of having done the type of charitable deed he was led to believe that he was doing. In

*Perry, supra,* "petitioner made false representations to Miss Jocelyn about existing circumstances concerning the status of his ownership of the Aureola property, which statements were calculated to mislead" her and which induced her to lend money to petitioner (p. 284), just as the statements in our case were calculated to mislead and did mislead the subscribers to purchase what they would not otherwise have purchased. ▇ "It is not necessary that the defrauded party rely entirely upon the defendant's misrepresentation in parting with his property. 'The false pretense or representation must have materially influenced the owner to part with his property, *but the false pretense need not be the sole inducing cause.*' (*People* v. *Ashley, supra,* 42 Cal.2d 246, 259.) (Emphasis added.)" (*Perry* v. *Superior Court,* p. 286.)

The gist of the crime is in the obtaining of the money by reason of the false representations. (*People* v. *Schmidt* (1926) 79 Cal.App. 413, 417 [249 P. 832, 250 P. 1104].)

▇ "Even if property is worth the consideration paid therefor, this is not a defense where there is substantial evidence, as in the present case, that defendant knowingly made false representations with the intent to defraud and with the purpose and effect of inducing the prosecuting witness to part with something of value. (*People* v. *Raines,* 66 Cal.App.2d 960, 962 [153 P.2d 424].)" (*People* v. *Pugh* (1955) 137 Cal.App.2d 226, 232-233 [289 P.2d 826]; see also *People* v. *Bryant* (1898) 119 Cal. 595, 597 [51 P. 960].)

In *People* v. *Schmidt* (1956) 147 Cal.App.2d 222, 228 [305 P.2d 215], in answer to the contention "that the evidence does not disclose that Mutual [the victim] ever lost the money in question" the court said: "It has been held in cases of this type that it is not necessary to show that the victim was actually out of pocket."

"Financial loss is not a necessary element of the crime." (*People* v. *Talbott* (1944) 65 Cal.App.2d 654, 659 [151 P.2d 317].)

The cases cited by defendants are not in point, as the false representations in them were not material inducements. In *People* v. *Bliss* (1920) 47 Cal.App. 503 [190 P. 1046], the defendant falsely stated that she was possessed of certain moneys and owned several valuable pieces of property in addition to a valuable mining property which she did own, a one-third interest in which she sold to the complaining witness. She also promised him a job at the mine. He received both the interest and the job. There was no contention that

he was buying any interest in the nonexistent properties. The court held that the misrepresentations were not material to the sale.

In *People* v. *Tufts* (1914) 167 Cal. 266 [139 P. 78], the defendant falsely represented that he had a power of attorney from his wife so that he could secure a loan by transferring certain notes. Although he had no power of attorney he did have authority to make the transfer. Thus the misrepresentation was not material.

In *People* v. *Morphy* (1893) 100 Cal. 84 [34 P. 623], the defendant sold groceries to a retail grocer at a price he said was lower but in fact was higher than they could be obtained elsewhere. To effect the sale the defendant falsely stated that he was the representative of a San Francisco business house. The court held that the goods were sold at a fair price and not otherwise misrepresented; that the statement about the price being lower than elsewhere was merely a trick of the trade not within false pretenses; and that the buyer presumedly had knowledge of the value and could have inquired before purchase. The representation as to the capacity of the seller did not assume the proportions either in character or influence on the buyer which the representations did on the subscribers in our case.

In our case, as we have shown, the misrepresentations were material. The subscriptions would not have been obtained without them. Moreover, the subscribers never received the main thing they had expected to receive : the true satisfaction of enabling the solicitors to obtain their alleged operations or releases from home and hospital.

In *People* v. *Griesheimer* (1917) 176 Cal. 44 [167 P. 521], the defendant had falsely represented that he was employed by the Fatherland Magazine to collect subscriptions and loans to be used in furthering pro-German sentiment in the United States just prior to our entry into World War I. As part of his soliciting scheme he exhibited a false list of German-Americans who had allegedly contributed specified amounts for this purpose. The trial court instructed that if a false list purporting to contain the names of subscribers and the amounts of their subscriptions to a fund is exhibited to another person, with a view of inducing him to also subscribe to the fund, by a person who knows that the representations concerning the list are false, and who makes them with intent to induce the other person to subscribe money, and if such other person believes them to be true and because thereof is

induced to subscribe—the person making those misrepresentations would, as a matter of law, be guilty of obtaining money under false pretenses. In upholding the instruction, the Supreme Court said: ''Reading the instructions on this subject as we have set them forth, it is plain enough that it was made perfectly clear to the jury that in order to convict upon the ground that any particular representation was falsely and fraudulently made, they must be satisfied beyond all reasonable doubt that the representation was material in inducing Mr. Muck to part with his money.'' (P. 52.)

This language is appropriate to our case, although there the victim intended that the defendant receive the money for one purpose, while in our case the money was paid for two purposes, (1) for magazines which the victim did not want, but which he or his nominee received, and (2) to aid an epileptic or orphan, which purpose was not accomplished because no such person existed.

Had the solicitors made these same false pretenses and directly appealed for charitable donations for themselves, a prosecution for false pretenses clearly would have lain. (See Note 145 A.L.R. 302 (1943).) Because a fraudulent appeal to the charity of the buyer was joined with the sale of a magazine subscription should not change the result.

In dismissing the indictment the trial court indicated that an indictment could be brought charging a conspiracy to violate two other code sections, section 532b, Penal Code, and section 17500, Business and Professions Code. However, as long as there was reasonable and probable cause to prosecute in the manner indicted by the grand jury, that prosecution should not be precluded by the existence of alternate charges. (*People* v. *Campbell* (1899) 127 Cal. 278, 282 [59 P. 593].) There is no obligation that one offense be charged rather than another.

 The argument of defendants that the false characterization by the solicitor of his condition and need is something akin to the type of ''puffing'' of merchandise which is recognized in the marts of trade, is ingenious but unsound and untrue.

This type of crime is a most heinous one, falsely appealing as it does to the laudable charitable instincts of mankind. Housewives alone at home are particularly susceptible to the appeal to their emotions. With a thrill of satisfaction at thinking they are able to help a fellow being in distress, they pay out their money for something they do not particu-

larly want. The perpetrators of this type of offense are no better than the highwayman who obtains his money from the use of force and threats.

The evidence before the grand jury established reasonable and probable cause of the commission by defendants of the crime charged.

The order is reversed.

Sullivan, J., and Draper, J.,* concurred.

Respondents' petition for a hearing by the Supreme Court was denied October 17, 1962.

*Assigned by Chairman of Judicial Council.