[Crim. No. 3352. Third Dist. May 15, 1963.]

THE PEOPLE, Plaintiff and Respondent, v. FORREST M. SETER et al., Defendants and Appellants.

240

J. L. Levitt and Wallace Lund, in pro. per., and Richard G. Burns for Defendants and Appellants.

Stanley Mosk, Attorney General, and Raymond M. Momboisse, Deputy Attorney General, for Plaintiff and Respondent.

PIERCE, P. J.—Appellant Forrest M. Seter is one of six defendants indicted and tried for conspiracy to commit theft. Three of said defendants, J. L. Levitt, Wallace Lund and Forrest M. Seter, were convicted. All three appealed but only Seter has filed a brief. Appellants Lund and Levitt were each duly notified by this court, pursuant to California Rules of Court, rule 17(a)* that unless a brief was filed within 30 days or good cause shown their appeals would be dismissed. No such showing has been made; no requests for relief were made; no briefs have been filed or submitted. The appeals of said Lund and Levitt will, therefore, be dismissed. Seter will hereinafter be referred to as appellant.

The conspiracy charged arises out of the activities of appellant and the other convicted defendants in the sale of so-called "memberships" in an organization (incorporated as a nonprofit corporation) known as California State Law Enforcement Officers Association. (Sale of advertising space for a magazine published by and for that organization is also somewhat incidentally involved.)

The theory of the prosecution was that the alleged conspira-

---

*Formerly Rules on Appeal, rule 17(a).

tors actually schemed to and did obtain this money to be held and kept by themselves.

The trial commenced October 2, 1961, and ended November 14, 1961. The transcript of its proceedings is in 10 volumes with 2,270 pages. ■■ A principal contention of appellant is that the verdict against him is unsupported by substantial evidence.

During the period with which we are concerned, August 1960-May 1961, the "association" operated out of two offices, one in San Francisco, where appellant made his headquarters with defendant Levitt as part-time associate and assistant. The other office was in Sacramento, which office defendant Wallace Lund operated.

Memberships were sold by means of telephone salesmen located in both offices. These salesmen were given typewritten data and copies of the organization's magazine to use. In making their persuasive appeals, these data were freely and sometimes imaginatively construed.

Most of the evidence related to the activities of the Sacramento office. Twelve or more citizens of the area testified to the successful solicitation of substantial sums of money from them under varying representations. Two women employees added their own testimony, freely admitting these representations, but protesting innocence regarding knowledge of their falsity. One salesman of the San Francisco office and one solicitee in that city also testified for the People.

The representations, although varying in scope, usually, if not always, included a statement to the effect that membership was comprised, as the name of the association would imply, "of law enforcement officers in all phases of the profession" but that it was open, on an invitational basis and by recommendation to selected private citizens; that it worked closely with all branches of law enforcement. Always included was a statement that a "Juvenile Assistance Trust Fund" was maintained, created to assist youngsters worthy of support and to aid in wiping out juvenile delinquency. Persons solicited were told sometimes that "all" or "most" or "a large portion" of the moneys contributed as "membership fees" would go into this fund. The specific purposes of the fund were variously described. Some prospects were told that a youth recreation building was to be erected; others that Boy Scout troops were being organized or outfitted. One can infer from the record that frequently the particular purpose stated was tailored to fit any specific project affecting youths in

which the person solicited had indicated an interest earlier in the conversation.

Solicitees were also told about a fully-equipped "Mountain Rescue Unit" staffed by trained personnel already in operation, with another to be soon organized in Sacramento. An oxygen tank was stated to be a part of the equipment. The existing unit was said to be on call 24 hours daily to "state areas where local equipment is overtaxed and additional help is needed." It was stated " [t]he vehicle and staff have been instrumental in saving lives in its short history and lending assistance on accident scenes." The soliciting salesmen represented themselves to be unpaid volunteers and implied, and sometimes stated, they were police officers acting on their own time.

If the telephone solicitation was successful or if sufficient interest seemed to have been awakened, a "collector" would then be sent to call on the prospect. In Sacramento this was undertaken by an employee, the defendant Baker, or by defendant Lund, the Sacramento manager. These two would repeat as much of the original pitch as might be necessary. They also sometimes represented themselves as unpaid volunteers. Upon payment of all of the "membership fee" or such part as the collectors could get, a "membership kit" was issued. Included in this kit was a metal lapel badge (so closely similar to that of the California Highway Patrol as to be indistinguishable), a special "merit award," a "membership card" and several windshield stickers.

To some of the new "members" it would be represented, usually with some indirection, that parking tickets could be fixed by use of the stickers or the membership cards. Seter, in testifying, justified the practice of solicitors using military titles on the theory that these titles had been bestowed by him as the "rank" of salesmen in their capacity as members of the "rescue unit."

Whatever may have been the nature and integrity of this organization in its inception, it was not, at the time of any of the events involved here, an association of law enforcement officers at all. As Seter himself testified: "I am the association." He described it as a "vest pocket" organization. He hired and fired personnel at will, opened and closed bank accounts, falsified corporate minutes of unheld meetings; answered to no one. There was no actual membership participation in the business of the "organization." Although Seter had at one time been a state police officer, he had had no con-

nection with any law enforcement organization for several years, and none of the others employed by him ever had had any association whatever with law enforcement work. In the phone solicitations and in printed brochures the public was told that the "association" was the largest California association of law enforcement officers and citizen members with members in every branch of law enforcement. This representation was repeated over and over again. It had no foundation in fact. Appellant testified he had no idea what the size of the membership of the association actually was and on cross-examination could not tell how many, if any, of its members were in law enforcement.

"Membership" prospects were not in fact selected by recommendation. On the contrary, names were taken from the yellow pages of the telephone book or from the city directories. These prospects were informed, however, that they had been chosen as the result of careful selection but that the association's rules prohibited disclosure of the identity of other members except at the periodical banquet of members.

As to the representation that the "Association" was working closely with every branch of law enforcement, the record shows that substantially there was no such connection or working arrangement. Specifically in the Sacramento area there was no connection with the City of Sacramento Police Force, the sheriff's office, the California Highway Patrol or any other law enforcement agency.

As to the "Juvenile Assistance Trust Fund," although two accounts by that name had been opened by Seter in a San Francisco bank, one with a $5.00 deposit and the other for $1.00 (this a year before any of the events here involved), no other moneys whatever had ever gone into the fund even for temporary repose. Bank service charges had dissipated one account. The creation of these accounts was accomplished by Seter, first by falsification of corporate minutes, also by the filing of signature cards in which the name of the corporate secretary was written by him.

As stated above, none of the moneys collected ever went into the trust fund. Where they did go was as follows: Each prospect was asked to pay $50 for a "membership." Lesser sums, however, were welcomed: $10, $20, $25 or $30, whatever could be obtained. Of the sums solicited in Sacramento, 50 per cent went to Seter in San Francisco, and the other 50 per cent was divided in Sacramento between Lund, the phone salesman who made the pitch, and the collector. In

Sacramento it was admitted by Lund that his "cash book" showed that in the comparatively short period the office operated before the indictment $10,000 was received for "memberships" and this book did not reflect certain sums which the testimony showed were actually paid. In San Francisco during 1960 more than $20,000 was collected. Not only was none of this money paid into the trust fund for juvenile assistance, neither was any portion *used* for that or any of the other promised purposes.

Regarding the so-called "rescue unit" described in the "spiel" of the salesmen, it consisted of a second-hand panel truck purchased "on time" for $600. It was painted green, with a large 7-pointed gold or yellow star encircling an emblem (closely simulating the state seal), emblazoning each side. Also on the sides were the words "rescue unit" later changed to "mountain rescue unit." It was also equipped with a red light until use of this was questioned by the San Francisco police. Inside this truck (as a basis for the representation that it was "fully equipped") was a two-way radio with a three-block effective range, a portable winch, two blankets, some rope and a canvas cot purchased from an army surplus store. As basis for the claim that "the unit" was equipped to take care of 50 disaster victims, there were first aid kits capable of supplying band-aids and snake bite remedies to 50 persons. There was no oxygen tank. This truck was driven by a collector employed by Seter, one William Donovan, whose advancement from "sergeant" to "lieutenant" to "captain" was accomplished within a span of a couple of weeks. Donovan was also furnished with a navy blue uniform, a badge, gold bars and a military hat with plastic visor. One prospect confused the uniform with a police uniform; another with the uniform of the agencies which make currency deliveries to banks. The truck was actually used solely for the purpose of calls made by Donovan to pick up the fruits of telephone solicitations. Donovan was a prosecution witness. He testified the truck was kept by him at his home at night. This was apparently what was meant by the claim it was "on call 24 hours a day." Its only excursion into the mountains had been a weekend pleasure trip taken by the Donovan family. Neither Donovan nor any member of Seter's organization was ever trained for disaster work. No disaster rescue or accident relief was ever accomplished.

In addition to the misrepresentations hereinabove stated there were others regarding advertising space sold, regarding

members' banquets which were promised but never held, display booths at fairs which did not materialize, etc. It is unnecessary that the fraudulent schemes by which money was extracted be set forth in further detail here. It is particularly unnecessary since appellant concedes some of the substantial misrepresentations.

Appellant's brief (on pages 18 and 19) freely concedes that "Lund and his employees recklessly and deceptively represented to CSLEOA prospects that membership receipts would go, in whole or in large part, into a Juvenile Fund or to fight juvenile delinquency" and he added, "Lund referred to members as 'suckers.' " The record does not sustain appellant's attempt to shed responsibility and shift it to Lund and the other defendants.

The so-called "Juvenile Assistance Trust Fund" was not conceived by Lund or any of the Sacramento employees. It was Seter's idea. Although a nominal bank account, it had no *substantial* existence. The original representations regarding this fund moreover and its purposes are Seter's own representations, printed under his authorship in the magazine which was itself a primary means of fund solicitation. True, these printed representations were embellished by the phone salesmen, but Seter made once or twice weekly visits to the Sacramento office, arriving, as one witness testified, at 11 o'clock in the morning when the telephone solicitation was going on. And he was observed walking around the office while the telephone salesmen made their appeals. This witness testified: "Each time that Mr. Seter came into the office, he was present when the membership pitch was being given . . . Q. Did Mr. Seter ever have occasion to walk around the office and see what was going on? A. Yes." There was also in one portion of defendant Lund's testimony a statement that Seter had informed him that the money taken in in Sacramento was being put in the Juvenile Assistance Fund. (This was partially contradicted by the witness later in his testimony, but the jury was entitled to believe the affirmation and disbelieve its retraction.) Other evidence established full familiarity by Seter with the misrepresentations made by his telephone salesmen in San Francisco. Seter was also the author of the published misrepresentations mentioned above.

The evidence above supports the jury's finding of a conspiracy to commit theft.

Penal Code section 484, defining the acts constituting theft, provides (so far as applicable here): "Every person . . . who

shall knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other person of money ... is guilty of theft."

Regarding the crime of conspiracy this court stated in *People* v. *Saugstad,* 203 Cal.App.2d 536, 548 [21 Cal.Rptr. 740] : "The essential element of the crime of conspiracy is the unlawful agreement between two or more persons to commit an offense prohibited by statute, accompanied by some overt act in furtherance of such agreement. [Citing cases.] The unlawful agreement may be established by circumstantial evidence, and it is rare when the conspiracy can be established by direct evidence. [Citing cases.]"

It was held in *People* v. *Chavez,* 208 Cal.App.2d 248, 253 [24 Cal.Rptr 895] : ". . . It is seldom possible for the prosecution to offer direct evidence of an agreement to commit a crime. The agreement to commit the crime is usually made in secrecy. The conspiracy must be inferred by the trier of fact from all the circumstances that are proven, and if the inference is a reasonable one it will not be disturbed on appeal. [Citing cases.]"

And as observed by the court in *People* v. *Northrup,* 203 Cal.App. 470, 475-476 [21 Cal.Rptr. 448] : ". . . The only proof available may result from actions of the parties which manifest an intent to carry out a common purpose to violate the law. [Citing cases.]"

In *People* v. *Conlon,* 207 Cal.App.2d 86 [24 Cal.Rptr. 219], it was shown that defendants, charged with conspiracy to commit theft, had solicited subscriptions to magazines, some of them representing themselves to be epileptics just released from a veterans' hospital, others representing that they were orphans participating in a "National Youth Opportunity Program." The representations were false. It was held that a conspiracy had been shown and that there were present all of the elements of the crime of theft, to wit: (1) an intent to defraud; (2) an actual fraud committed; (3) the use of false pretenses to perpetrate the fraud; and (4) reliance upon the fraudulent representations in parting with money. The facts here (and it is unnecessary to repeat them) show all four elements with greater clarity.

Appellant complains of the failure of the court to give unrequested instructions. This can be urged in a proper case and is ground for a reversal. (*People* v. *Putnam,* 20 Cal.2d 885, 890 [129 P.2d 367].) "The circumstances of the case must determine whether the failure to instruct the jury consti-

tutes prejudicial error." (*People* v. *Putnam, supra,* p. 892.) "Reviewing courts will scrutinize with great care any claim of prejudicial error predicated solely upon the omission of the trial court to give of its own motion an instruction, the propriety of which is indicated solely by the condition of the evidence." (*People* v. *Davis,* 43 Cal.2d 661, 674 [276 P.2d 801]; *People* v. *Roberts,* 167 Cal.App.2d 238, 246 [334 P.2d 164].)

Appellant contends first that the trial court failed to instruct adequately on the specific intent element of the crime of conspiracy to commit theft and he specifies particularly that it "failed to instruct the jury as to the necessity for finding a common intent, amounting to an agreement between two or more defendants to obtain property by false pretense."

The instructions given here on the nature of a criminal conspiracy were quite comprehensive. We deem it unnecessary to quote them in full. They cover several pages of the transcript. The jury was told: "The law defines a conspiracy to be an agreement or understanding between two or more persons that they will commit an unlawful act, that is, that they will combine together to accomplish by the united action a criminal or unlawful purpose . . . and in furtherance thereof an overt act is committed by one or more of the parties to the agreement." They were told this in several ways, the necessity of an agreement being emphasized. They were told that in adoption by a person of a criminal design he must act in "common" with the others. They were given the standard instruction that "[i]n every crime or public offense there must exist a union or joint operation of an act and intent." The jury was also fully and correctly instructed as to the definition of the crime of theft by obtaining money by false pretenses; all of the elements (as stated above) were explicitly set forth. These instructions were adequate.

Further complaint is made that the court failed to instruct the jury in the language of Penal Code section 1110 that "[u]pon a trial for having, with an intent to cheat or defraud another designedly, by any false pretense . . . obtained from any person any . . . money. . . ." the pretense must be "proven by the testimony of two witnesses, or that of one witness and corroborating circumstances; . . ." The offense which that section covers is the crime of theft. Conspiracy is, however, an offense distinct from the actual commission of the offense forming the object of the conspiracy. (*People* v. *Holstun,* 167 Cal.App.2d 479 [334 P.2d 645].)

▮ Therefore the code section is, by its terms, inapplicable. The prosecution did prove, but did not have to prove, theft.

▮ The crime charged is proved when the proscribed agreement or understanding, plus an overt act towards its execution, has been proved. Moreover, even assuming the applicability of the section, there could have been no prejudice here since the acts which formed the basis of the charge of ''pretense'' were established not by one but by more than a dozen witnesses with many substantial corroborating circumstances.

▮ Appellant appeared before the Attorney General (before his indictment) and made a statement. He now cites and urges the applicability of *People* v. *Bevins,* 54 Cal.2d 71 [4 Cal. Rptr. 504, 351 P.2d 776], holding that where there is conflicting evidence as to the voluntariness of a confession the trial court is required to submit to the jury the question as to whether the confession was voluntary. Here, however, the statement was given freely and voluntarily. There is no conflict in the evidence on this point. Moreover, appellant took the stand, testifying in his own behalf, and repeated substantially everything that had been included in his extrajudicial statement. The giving of the instruction could have served no purpose. (*People* v. *Combes,* 56 Cal.2d 135, 148 [14 Cal. Rptr. 4, 363 P.2d 4].)

Multifarious citations of misconduct by the deputy district attorneys who tried the case have been made by appellant. These relate both to questions asked witnesses and to the arguments. We have examined the contentions carefully, find none of them substantial, and most of them so insubstantial as to warrant no mention. ▮ A charge most earnestly advanced is that it was prejudicial error to produce as witnesses various public officers who testified that their agencies had had no connection with defendants' organization, that they were not ''working with it'' and had no intention of doing so. This testimony was properly admitted. As shown above, one of the representations being made by appellant was that his ''organization'' was the largest California association of law enforcement officers and citizen members with members in every branch of law enforcement. The testimony tended to disprove this statement.

Appellant cites *People* v. *Gaertner,* 43 Cal.App.2d 388 [110 P.2d 1002], a criminal conspiracy case where it was held prejudicial error to permit several judges to testify that they had not consented to have their names used as members of committees of the association with which the accused were

identified. A close reading of this case, however, reveals that there, unlike the instant case, the question of whether the persons who testified had or had not authorized the use of their names had no bearing upon the issues, since the defendants involved were not shown to have authorized or acquiesced in the misrepresentations made by the soliciting salesmen who had named the judges as members. The case is thus distinguishable.

The contention that it was improper to show that the lapel badge furnished to "members" was identical with the badge of the California Highway Patrol falls for the same reason. Its use tended to prove that appellant was trying to identify his "organization" with that law enforcement agency.

 It is true that neither of these misrepresentations fall within the specific overt act alleged in the indictment. But the prosecution is permitted to introduce evidence of other misrepresentations in the course of the conspiracy if such are part of the same plan. (*People* v. *Chapman,* 207 Cal.App.2d 557, 577 [24 Cal.Rptr. 568]; *People* v. *Gordon,* 71 Cal.App.2d 606, 632 [163 P.2d 110].)

 Another incident of claimed misconduct urged by appellant relates to a question asked a prosecution witness, Mrs. Asplund, by the prosecuting attorney, as to whether during the short period of her employment in the San Francisco office as a secretary she had ever noticed "that they were doing anything that they should not be doing" or anything "that wasn't proper." This witness had already indicated that she had *not* been aware of any improper conduct and in context it was obvious that the deputy district attorney was calling for a "No" answer. In fact to emphasize that this was his purpose he reframed the question: "Q. Well, let me ask you this, you didn't see anything that was wrong while you were there, did you?" Even this question was objected to, the objection was sustained, and the jury admonished. There was no prejudice. The answer, if permitted, would have favored, not harmed, appellant.

No other points raised by appellant need be noticed. Considering the length of the trial (six weeks) and the excessive number of rulings the court was called upon to make the record is exceptionally free from error.

For the reason heretofore stated, the appeals of Lund and Levitt are dismissed. The judgment against Seter is affirmed.

Schottky, J., and Friedman, J., concurred.

The petition of appellant Seter for a hearing by the Supreme Court was denied July 10, 1963. Peek, J., did not participate therein.