[Crim. No. 4665. Third Dist. Apr. 15, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. RUTH ELIZ-
ABETH CHAPMAN, Defendant and Appellant.

Richard E. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Doris H. Maier, Assistant Attorney General, and Michael H. Fabian, Deputy Attorney General, for Plaintiff and Respondent.

FRIEDMAN, J.—Ruth Elizabeth Chapman appeals from a judgment imposing concurrent life sentences, after a jury found her guilty of the first degree murder and first degree robbery of Billy Dean Adcock. Mrs. Chapman and a codefendant, Thomas Teale, had been tried together in San Joaquin County in April 1963 and found guilty of Adcock's murder, robbery and kidnaping. Their convictions were affirmed by the California Supreme Court in July 1965 and set aside by the federal Supreme Court for trial error in February 1967. (*People* v. *Teale,* 63 Cal.2d 178 [45 Cal.Rptr. 729, 404 P.2d 209] ; *Chapman* v. *California,* 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824].) After the remand to the California courts, separate trials were ordered and the kidnaping charge dropped. In response to Mrs. Chapman's motion, a change of venue to Sacramento County was ordered and her second trial occurred in the latter county.

## Right to Speedy Trial

Shortly before her second trial in 1967 defendant moved to dismiss the proceeding on the ground that delays in her first trial in 1963 had deprived her of her constitutional right to a speedy trial. She renews the claim here.

Federal and state constitutional guaranties of a speedy trial in criminal cases are implemented by Penal Code, section 1382, which makes dismissal mandatory when a felony defendant is not brought to trial within 60 days after the information or indictment is filed, except where the defendant has consented or good cause for delay is shown. Mrs. Chapman had been found and arrested in Missouri on October 26, 1962, and brought to California. On November 13, 1962, the public defender of San Joaquin County was appointed to represent her and Teale. The two defendants were jointly indicted on November 16, 1962. They were not brought to trial, however, until April 16, 1963, approximately three months after expiration of the 60-day period following their indictment.

A condensed history of the proceedings antedating the April 16 trial appears in *People* v. *Teale, supra,* 63 Cal.2d at

page 186.[1] In essence, it demonstrates that part of the delay was caused by the emergence of conflicting interests between the two defendants, requiring withdrawal of the public defender as attorney for both defendants and the appointment of separate counsel for each; that postponement of the trial from March 19 to April 16, 1963, was permitted in order to provide Teale's new attorney time for trial preparation. Counsel for Mrs. Chapman vigorously resisted the postponement, made motions to dismiss and, alternatively, moved for severance of the Teale and Chapman trials. The prosecution, however, urged a joint trial and the court sustained the prosecution's position. Thus the month-long postponement to protect Teale's interests worked a parallel delay in the trial of Mrs. Chapman. ▮▮▮ On her first appeal the Supreme Court rejected the claim of unconstitutional trial delay, declaring (63 Cal.2d at p. 186): "Where a continuance is granted upon good cause to a codefendant the rights of the other defendants are generally not deemed to have been prejudiced. [Citations.] Moreover, assuming without concluding that there was an improper denial of a speedy trial, the error must be prejudicial to merit a reversal therefor. [Citation.] Although Mrs. Chapman asserts that the delay caused her an emotional upset which persuaded her not to testify in her own behalf she still fails to show how her testimony would have aided her cause."

▮▮▮ Defendant points out that the California Supreme Court's notion of "good cause" for trial delay was formulated by standards prevailing in 1963 when the trial court acted. She asserts that two later decisions demand reappraisal of that notion. The first is *People* v. *Clark* (1965) 62 Cal.2d 870, 882-886 [44 Cal.Rptr. 784, 402 P.2d 856], in which the Supreme Court directed dismissal of murder charges against

[1]The opinion states:

"Mrs. Chapman's first contention, that she was denied her constitutional right to a speedy trial, is not borne out by the record. She voluntarily waived the 60-day limit (Pen. Code, § 1382, subd. 2) and trial was set for February 5, 1963. On that date appointed counsel, the public defender, withdrew due to a conflict in interest in his representation of both her and the defendant Teale. New counsel appointed for Mrs. Chapman on February 5 instituted discovery proceedings and trial was postponed until March 19, presumably in the defendant's interest. (*People* v. *Donohoe*, 200 Cal.App.2d 17 [19 Cal.Rptr. 454].) Prior to the March 19 trial date Mrs. Chapman filed an affidavit that the public defender's prior representation of her would prejudice her right if a joint trial was had, and the court permitted the public defender to withdraw as counsel for Teale also. New counsel was appointed for Teale and the trial was again postponed, to give such counsel an opportunity to prepare, until April 16, when trial was had."

two of three jointly tried defendants, the ground being unconstitutional delay of their trial. The *Clark* case is not in point. There the prosecution successfully argued against the severance of a proposed joint trial and sought trial continuances without divulging evidence which would have militated toward trial severance. Since the prosecution induced the trial court to act without full knowledge of the facts, the Supreme Court concluded that good cause for delays beyond the 60-day period was nonexistent. (62 Cal.2d at pp. 884-885.) Here, in contrast, the trial was not postponed at the prosecution's behest but to protect the interests of a codefendant, who requested additional time for trial preparation. Although Mrs. Chapman's motions for severance were opposed by the prosecution, there is no claim of bad faith or nondisclosure of evidence.[2] Thus the lack of good cause which appeared in *Clark* did not characterize the present proceeding.

The second decision invoked by defendant is *People* v. *Aranda* (1965) 63 Cal.2d 518, 528-531 [47 Cal.Rptr. 353, 407 P.2d 265]. ▉ Generally speaking, *Aranda* calls for the severance of trials where evidence of an extrajudicial statement by one defendant will implicate a jointly charged defendant. The *Aranda* rule represents a palpable change in California standards for the consolidation and severance of criminal trials, since prior case law had proceeded on the assumption that juries could be effectively admonished to disregard evidence admitted against less than all of a group of jointly tried defendants. (See *People* v. *Chambers* (1964) 231 Cal.App.2d 23, 32-33 [41 Cal.Rptr. 551].) The new rule is retroactively available to a defendant who had been tried prior to the date of the *Aranda* decision, November 12, 1965, where (as is true of Mrs. Chapman) the conviction was pending on appeal on that date. (*People* v. *Charles* (1967) 66 Cal.2d 330, 332 [57 Cal.Rptr. 745, 425 P.2d 545].)

▉ Here the prosecution had evidence of an extrajudicial statement made by Teale to a fellow jail inmate, a statement which implicated Mrs. Chapman in Adcock's death. Assumedly, had the *Aranda* rule existed in the spring of 1963, it would have impelled trial severance, thus preventing Teale's needs from delaying Mrs. Chapman's trial. The claim

[2]In another connection the opinion in *People* v. *Teale* observes (63 Cal.2d at p. 190): ''There is, in fact, no basis for a reasonable belief 'that the prosecution withheld any information in its possession or other-wise frustrated the defendants. There is no claim that particular *information*, as distinguished from the nature of the recording thereof, has been withheld.''

that the 1965 *Aranda* decision retroactively extracts the vitalizing element of good cause from the 1963 postponement of Mrs. Chapman's trial is as inacceptable as it is novel. Reformulations of decisional law may be prospective or entirely or partially retroactive. (See examples collected in *People* v. *Feggans* (1967) 67 Cal.2d 444, 449 [62 Cal.Rptr. 419, 432 P.2d 21], separate opinion of Peters, J.) A retroactive decisional rule may alter the legality of a preexistent event, but it cannot alter preexistent facts. ▮ The exercise of trial court discretion over trial consolidation and severance must be based "upon a just and proper consideration of the particular circumstances which are presented to the court in each case;" when reviewed by the appellate courts, it will be measured by the facts existing at the time of the motion and not those occurring afterward. (*People* v. *Eudy* (1938) 12 Cal.2d 41, 46 [82 P.2d 359], quoted and paraphrased in *People* v. *Clark*, *supra*, 62 Cal.2d at p. 883.) ▮ Thus the hindsight of *Aranda* is not available to degrade the circumstances which the trial court accepted as good cause for postponing Mrs. Chapman's first trial and which impelled the Supreme Court, on her first appeal, to reject the claim of denial of speedy trial. Since the later change of legal doctrine is inapplicable to those circumstances, that rejection is the law of the case and may not be reargued. (*People* v. *Modesto* (1967) 66 Cal.2d 695, 705 [59 Cal.Rptr. 124, 427 P.2d 788]; *People* v. *Terry* (1964) 61 Cal.2d 137, 151 [37 Cal.Rptr. 605, 390 P.2d 381].)

### Sufficiency of the Evidence

Although the trial court's instructions to the jury included a definition of premeditated murder, the prosecution's prime theory was felony murder, that is, first degree murder committed in the perpetration of robbery. The jury found Mrs. Chapman guilty of robbery as well as first degree murder. ▮ Defendant claims lack of substantial evidence of her participation in robbing and shooting Adcock and of her specific intent to participate in the robbery ▮ To establish a felony murder the prosecution must prove that the defendant had a specific intent to commit the felony, in this case the robbery of Adcock. (*People* v. *Anderson* (1965) 63 Cal.2d 351, 358 [46 Cal.Rptr. 763, 406 P.2d 43].) ▮ A principle of California law, known as the *Wells-Gorshen* or diminished capacity rule, has it that an impairment of volitional powers by a mental defect short of insanity may negate the existence of specific intent to commit

a particular crime. (*People* v. *Anderson, supra,* 63 Cal.2d at pp. 364-365; *People* v. *Gorshen* (1959) 51 Cal.2d 716, 727-728, 731-734 [336 P.2d 492]; *People* v. *Wells* (1949) 33 Cal.2d 330, 346-347 [202 P.2d 53].) Evidence of intoxication is relevant to prove lack of capacity to form specific intent. (See cases cited *People* v. *Anderson, supra,* 63 Cal.2d at pp. 365-366.)

■ Called upon to review sufficiency of the evidence, appellate courts recognize that a defendant's guilty participation in a crime may be established by circumstantial evidence; that the fact trier, not the appellate court, must be convinced of guilt beyond a reasonable doubt; that the test on appeal is whether there is substantial evidence to support the verdict or finding; that the reviewing court will not reweigh the evidence but " 'will decide only whether upon the face of the evidence it can be held that sufficient facts could not have been found by the jury to warrant the inference of guilt.' " (*People* v. *Hillery* (1965) 62 Cal.2d 692, 702-703 [44 Cal. Rptr. 30, 401 P.2d 382].) Despite these generalizations, several California decisions reviewing first degree murder verdicts demonstrate a tendency toward close appellate scrutiny of conflicting evidence of mental capacity, particularly where a jury's finding of capacity for premeditated murder has been made in the face of evidence in precarious balance. (See, e.g., *People* v. *Nicolaus* (1967) 65 Cal.2d 866, 876-878 [56 Cal.Rptr. 635, 423 P.2d 787]; *People* v. *Goedecke* (1967) 65 Cal.2d 850, 857-858 [56 Cal.Rptr. 625, 423 P.2d 777].) For present purposes at least, we assume that the same kind of scrutiny devolves upon the reviewing court when specific intent to rob, rather than intent to kill, provides the foundation for a first degree murder verdict.

■ In summary, the prosecution evidence showed the following: Mrs. Chapman and Thomas Teale had been living together in Lake County. On October 10, 1962, they loaded Mrs. Chapman's automobile, a 1961 Ford Fairlane sedan, and left for Reno. On October 12 Mrs. Chapman purchased a .32 caliber automatic pistol in one Reno pawnshop and a .22 caliber ''Vestpocket'' revolver in another. In registering the purchases she signed her name, Ruth E. Chapman, and with one she gave her former Eureka address. From Reno the pair drove to Las Vegas where they gambled and lost money. During this time Mrs. Chapman was cashing bad checks on her overdrawn account at a Eureka bank.

On October 17 the pair registered at a Fresno motel, where Mrs. Chapman paid for their room with a bad check for $6.

162

At approximately 10 p.m. that evening they entered Croce's bar located south of Lodi on Highway 99. They remained there until after one a.m. During this period they drank beer. Three witnesses, including the bartender, were of the opinion that Mrs. Chapman was sober. Although she appeared to be tired, she was neatly groomed and wore glasses. At one time Teale went to the end of the bar and tried to place a side bet with two patrons shaking dice. Mrs. Chapman evinced irritation, telling Teale there was to be no more gambling. He told her to "shut up" and to sit down and drink her beer. She went outside and returned in a few minutes, telling Teale, "Let's go. We are not going to do anything here," or "We can't do anything here. Let's leave." They left Croce's at approximately 1:10 a.m., leaving four full beer bottles which had been set before them.

About 1:30 a.m. Mrs. Chapman and Teale entered the Spot Club, a Lodi bar about two miles from Croce's. Billy Dean Adcock was the bartender. Several patrons had the impression that Mrs. Chapman was intoxicated and had been crying. Her hair looked mussed, her eyes were puffy, and she was not wearing glasses. Other patrons left the bar shortly before the 2 a.m. closing time, leaving Mrs. Chapman, Teale and Adcock as sole occupants of the establishment. About 2 a.m. three persons, including Adcock, were seen in front of the Spot Club. Adcock was closing the door, and a man was standing close behind him with a coat over his arm covering his right hand. The third person was a woman and she was walking away.

Later that morning Adcock's body was discovered half-submerged in a drainage ditch in a remote rural area of Sacramento County, some miles north of Lodi. He had been shot three times with a .22 caliber pistol.[3] One bullet, which entered the back of his head, had been fired from a range of 18 inches; two bullets, entering the left side of the head, from a range of less than two inches. Nearby were some of his personal papers and his wallet. He had had $60 in his possession when he left for work the preceding day, but the wallet was empty. A $2 check bearing Mrs. Chapman's signature was near the body, as was a lipstick. Adcock had died between 2:30 and 3 o'clock that morning, according to an autopsy surgeon.

---

[3] The .22 pistol which fired the fatal bullets was of the same "Vestpocket" brand which Mrs. Chapman had purchased in Reno. The pistol was never found.

The owner of the Spot Club arrived at his establishment about 9 a.m. that morning. Adcock's car was parked nearby. The bar was not in its usual order. Approximately $266 was missing from the cash register. The unlocked safe, however, contained approximately $400.

About 4 a.m. on the morning of Adcock's death, Mrs. Chapman and Teale checked in at a motel in Woodland. Mrs. Chapman signed the registry giving a false name and a false automobile license number. On October 23 Mrs. Chapman arrived by bus in St. Joseph, Missouri, where she stayed with Teale's sister. During this time she asked Teale's sister if she might use the sister's name and social security card in order to get work. Mrs. Chapman was arrested in St. Joseph. Teale was apprehended in New Orleans. He was in possession of Mrs. Chapman's automobile and the .32 pistol she had bought in Reno.

Type A blood was found splattered on the interior roof lining of the automobile, on its dome light and clothes hanger. Adcock's blood was Type A. There was a concentration of this blood on the right-hand side of the automobile interior. Originating in the area of the passenger side of the front seat, the splatter radiated outward and to the rear. Fibers found in the automobile matched those found on Adcock's shoes. Also on Adcock's shoes were hairs resembling those of Teale. On the floorboard and floor mat were hairs which appeared to be Adcock's. On the floor mat of the automobile was red paint, which came from Adcock's shoes.

A criminalist testified that in his opinion Adcock had been shot once in the back of the head while he was sitting in Mrs. Chapman's car; that the wounds on the left side of his head were inflicted while he was lying down near the spot where his body was found.

A woman prison inmate told of conversations with Mrs. Chapman which had occurred while the latter was in prison after her first trial. On one occasion Mrs. Chapman said that she had "passed out" in the back seat of the car. In another conversation she said that Teale had been driving the car and that she had been in the back seat, while the victim sat on the passenger side of the front seat. The inmate testified that Mrs. Chapman at all times asserted her innocence.

Defense witnesses testified that Mrs. Chapman had in the past suffered from a nervous breakdown, blackouts, memory losses and had indulged in heavy drinking. Mrs. Chapman took the stand. She testified that she had been drinking

heavily and had been in an alcoholic stupor much of the time preceding the events of October 18. On that night the rear compartment of her car had been so loaded with her and Teale's belongings that no one could sit there. After her spat with Teale in Croce's bar, she went out to the car and drank most of a half pint of whiskey. She returned to the bar and screamed at Teale, who then came outside with her. Once they entered the car, Teale beat her, knocking off her glasses. She lost all memory of events after the beating and until they arrived in Woodland later that night. Some days later, during the train trip back from St. Joseph in police custody, she commenced to gain recollection of the intervening events. As she recalled these events, she was crying and disheveled and entered the Spot Bar only at Teale's insistence. Teale pulled out a gun and held up the bartender without her awareness of his intentions; took the bartender's wallet while they were in the bar; forced her to drive the car, Teale sitting in the center of the front seat and Adcock at the right side. She heard a shot, became hysterical, jumped from the car and ran; remembered nothing else until she arrived in Woodland.

Dr. Sheuerman, a psychiatrist called by the defense, testified that in his opinion Mrs. Chapman had suffered amnesia, induced by a combination of hysteria and alcohol, remembering nothing of the events after Teale had beat her outside Croce's bar and regaining her memory only days later; that during the events following the beating she had been in a mentally disordered condition (known to psychiatry as a "fugue" state) depriving her of capacity to form a specific intent to commit crime.

Introduced in evidence by the defense was a transcribed statement which Mrs. Chapman gave the Lodi police after her return from St. Joseph. Although this 1962 statement was not preceded by the police warnings later imposed by the *Miranda-Escobedo-Dorado* rule,[4] the defense specifically waived any constitutional objection to evidentiary use of the statement, offering it for the purpose of showing that Mrs. Chapman's claims of amnesia and of recall during the train trip back to California were not a recent fabrication. In this statement she told of purchasing the two pistols in Reno pawnshops. Her

4*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]; *Escobedo* v. *Illinois*. (1964) 378. U.S. 478 [12. L.Ed.2d 977, 84 S.Ct. 1758]; *People v. Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361].

description of the events preceding the shooting of Adcock approximately paralleled her trial testimony.

In rebuttal the prosecution called three psychiatrists, who held the view that—although the defendant possibly suffered amnesia which temporarily blocked memory of the incidents—she had not been unconscious and had been capable of forming a specific intent to commit criminal acts.

Under the felony-murder instructions the prosecution had to prove only a specific intent to rob Adcock, not a premeditated shooting or intent to kill. (*People* v. *Coefield* (1951) 37 Cal.2d 865, 869 [236 P.2d 570].) ▮ A killing in the perpetration of a robbery is murder of the first degree, whether wilful and premeditated or only accidental and whether or not it is planned as a part of the robbery. (*People* v. *Lookadoo* (1967) 66 Cal.2d 307, 314 [57 Cal.Rptr. 608, 425 P.2d 208].) Whichever of the robbers fired the fatal shot, both are guilty of first degree murder. (*People* v. *Miller* (1951) 37 · Cal.2d 801, 805-806 [236 P.2d 137]; *People* v. *Ellenberg* (1958) 165 Cal.App.2d 495, 500 [331 P.2d 1053].) ▮ From the evidence the jury could reasonably infer that Mrs. Chapman had participated in a jointly planned holdup. The pair's precarious financial situation, Mrs. Chapman's purchase of two pistols in Reno and her remark as they left Croce's bar, supplied the basis for the deduction that they had entered Croce's for the purpose of robbery if it were feasible, had left because too many patrons were there and had entered the Spot Club for the same purpose, waiting until the 2 a.m. closing time when the bartender was alone. This was not a bizarre crime whose very character pointed to dissolution of the accused's deliberative faculties. (Cf. *People* v. *Goedecke, supra,* 65 Cal.2d at pp. 855, 858; *People* v. *Nicolaus, supra,* 65 Cal.2d at p. 878; *People* v. *Wolff* (1964) 61 Cal.2d 795, 818-822 [40 Cal.Rptr. 271, 394 P.2d 959].) The events logically supported the belief that Mrs. Chapman shared a deliberate design to rob. The jury were at liberty to reject psychiatric opinion to the contrary. The belief that she had adequate awareness of the events at the time of their occurrence was supported both by the psychiatric testimony of the prosecution and by Mrs. Chapman's ability to recall these events in a tailored, self-protective version. The direction and distance of the first shot (fired from a point 18 inches to the rear of the victim's head) could reasonably induce the belief that Mrs. Chapman had concocted her description of the parties' relative positions, which placed her in the driver's

seat and placed Teale, the alleged gun wielder, between her and the victim. However circumstantial, the evidence was substantial that Mrs. Chapman shared with Teale a specific intent to rob the victim and that she consciously participated in a robbery in the perpetration of which the victim was killed by one participant or the other.

### Evidence Discovered as a Result of Post-Arrest Interrogation by Police.

After Mrs. Chapman gave the Lodi police the statement in which she told of having purchased pistols at two Reno pawnshops, a check of Reno pawnshop records resulted in identification of the pistol sellers. Over objection, the two sellers testified as prosecution witnesses at Mrs. Chapman's second trial. She charges error. Her theory is that the *Miranda-Escobedo-Dorado* rule would have barred the prosecution from adducing evidence of her 1962 statement, which had not been preceded by a warning of her rights; that the Reno pawnbrokers became known to the police as the result of the inadmissible statement; that their testimony was barred by the "fruit of the poisonous tree" rule, being as inadmissible as the statement itself.

At Teale's separate retrial he had raised the same objection to the testimony of the Reno pistol sellers. Outside the jury's presence, the court took evidence for the purpose of ascertaining the relationship between Mrs. Chapman's statement to the Lodi police and the identification of the pistol sellers. Concluding that the normal processes of police investigation would have uncovered the same information had the police been deprived of her statement, the court overruled Teale's objection. By stipulation the same objection, the inquiry and the ruling, were incorporated as part of the Chapman trial record.

The exclusionary rule of *Miranda* v. *Arizona, supra,* governs retrials, as well as original trials, occurring after June 13, 1966, the date of the *Miranda* decision. (*People* v. *Doherty* (1967) 67 Cal.2d 9, 17 [59 Cal.Rptr. 857, 429 P.2d 177].) Doubtless Mrs. Chapman's statement would have been inadmissible had it been offered by the prosecution, since she was in custody and the police had, without warning her of her rights, undertaken a process of interrogation lending itself to the elicitation of incriminating statements. (*People* v. *Rollins* (1967) 65 Cal.2d 681, 692 [56 Cal.Rptr. 293, 423 P.2d 221].)

Information and physical evidence secured as a

result of custodial interrogation of arrested persons, without a warning of their rights, may not be used against them. (*People* v. *Varnum* (1967) 66 Cal.2d 808, 812 [59 Cal.Rptr. 108, 427 P.2d 772]; *People* v. *Buchanan* (1966) 63 Cal.2d 880, 887 [48 Cal.Rptr. 733, 409 P.2d 957]; *Developments in the Law—Confessions* (1966) 79 Harv.L.Rev. 935, 1028-1029.) The ban extends to the verbal as well as the physical products of illegal questioning (*People* v. *Spencer* (1967) 66 Cal.2d 158, 166-167 [57 Cal.Rptr. 163, 424 P.2d 715]; see also *Wong Sun* v. *United States* (1963) 371 U.S. 471, 485-486 [9 L.Ed.2d 441, 453-454, 83 S.Ct. 407]; *People* v. *Bilderbach* (1965) 62 Cal.2d 757, 767 [44 Cal.Rptr. 313, 401 P.2d 921].) Nor does any distinction or narrowing result from the circumstance that the evidence was the product of police procedures antedating *Miranda-Escobedo-Dorado* and retroactively beclouded by later-announced constitutional doctrine (see, e.g., *People* v. *Spencer, supra*). ▮ Nevertheless, evidence is not "fruit of the poisonous tree" simply because it would not have come to light but for the illegal police action; the more apt question is " 'whether granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " (*Wong Sun* v. *United States, supra,* 371 U.S. at p. 488 [9 L.Ed.2d at p. 455]; *People* v. *Bilderbach, supra,* 62 Cal.2d at p. 766.) A parallel inquiry is whether the asserted "fruit" was in fact a product of the statement and whether it would have been discovered through an "independent source," such as police investigation independent of the illegal inquiry. (*Nardone* v. *United States* (1939) 308 U.S. 338, 341 [84 L.Ed. 307, 311, 60 S.Ct. 266]; *People* v. *Ditson* (1962) 57 Cal.2d 415, 443-444 [20 Cal.Rptr. 165, 369 P.2d 714]; *People* v. *Thomsen* (1965) 239 Cal.App.2d 84, 91 [48 Cal.Rptr. 455]; *Developments in the Law—Confessions* (1966), 69 Harv. L.Rev. 935, 1024; *Fruit of the Poisonous Tree—A Plea for Relevant Criteria* (1967) 115 U. Pa. L. Rev. 1136, 1142; see also *Silverthorne Lbr. Co.* v. *United States* (1920) 251 U.S. 385, 392 [64 L.Ed. 319, 321, 40 S.Ct. 182, 24 A.L.R. 1426]; *Killough* v. *United States* (1964) 336 F.2d 929 [119 App.D.C. 10]; *Coplon* v. *United States* (1951) 191 F.2d 749 [89 App. D.C. 103], cert. den. 342 U.S. 926 [96 L.Ed. 690, 72 S.Ct. 363].) ▮ It is said that a system of criminal justice relying on independent police investigation is preferable to one which

squeezes self-incriminating information out of the accused. (*Escobedo* v. *Illinois* (1964) *supra*, 378 U.S. at pp. 488-489 [12 L.Ed.2d at pp. 984-985].) The Lodi police had embarked on the preferred course through an extensive and systematic investigation of Adcock's murder. The bulk of the prosecution evidence was produced by the general investigation, not by the post-arrest interrogation of the accused. The record fully supports the trial court's determination that identity of the pistol sellers would have been independently revealed by standard investigative procedures.

Close to Adcock's body the police had found the $2 check signed by Ruth E. Chapman and drawn on a Eureka bank— hardly a subtle clue. The check was the starting point for an investigation which identified Mrs. Chapman and Teale as suspects; which identified Mrs. Chapman's automobile; which led to her discovery and arrest at St. Joseph (where she was staying with Teale's sister) and to Teale's arrest in New Orleans, where he was found in possession of Mrs. Chapman's automobile and a .32 caliber automatic pistol.

All these inquiries and resultant information preceded Mrs. Chapman's interrogation. Thus, quite aside from that interrogation, the police gained awareness of the make, model and serial number of one of the two pistols. The other was partially identified by ballistic examination of the death bullets, which revealed barrel markings pointing to a .22 caliber revolver whose parts were manufactured abroad, which was assembled in this country and sold under the brand name "Vestpocket."

One day after the murder the police had discovered the pair's visit to Croce's bar and had interviewed James Brooks, the bartender, and his wife, Marilyn, who had also been at the bar that evening. Both these witnesses identified Teale from pictures supplied by the State Bureau of Criminal Identification and Investigation. On the night of the murder Mrs. Chapman had told Mr. and Mrs. Brooks that she and Teale were returning to Eureka after gambling in Nevada. It is not clear whether she specifically mentioned Reno. Reno and Las Vegas, however, are the most prominent vacation and gambling locales in Nevada and, as it turned out, Teale and Mrs. Chapman had visited both these cities. Both the Reno pistol sellers maintained registries identifying weapons sold by make, model and serial number and designating the date of the sale and the buyer's name and address. Mrs. Chapman had signed the gun registry in each establishment, giving her correct name. Following partial identification of the death

weapon, the Lodi police had put out an ''all points bulletin'' describing it. The officer in charge of the investigation testified that standard operating procedure entailed requests to the police in areas in which suspects had traveled, seeking a check of pawnshop records to reveal gun sales or purchases. He testified that such a procedure would have been mandatory; that Mrs. Chapman's post-arrest statement only ''simplified it for us.'' A bulletin to Reno police specifically identifying the .32 caliber automatic would have revealed Mrs. Chapman as its buyer, while a routine completion of record examination on the day of its sale would have revealed her as the buyer of a .22 caliber revolver of the same type as the death weapon. ''Usual and commonplace investigatory procedures would have developed the damaging evidence . . . quite aside from the illegal [police action]. . . .'' (*People* v. *Thomsen, supra,* 239 Cal.App.2d at p. 91.) The evidence fully satisfied the ''independent source'' rule, which relieved the pistol sellers' testimony of constitutional taint despite the immediate relationship between the illegal interrogation and the discovery of their identity.[5]

*Legality of Search and Examination of Automobile*

 Mrs. Chapman was arrested in St. Joseph on October 26, 1962, and returned to Lodi in police custody on October 30. Three days later, on November 2, Teale was arrested in New Orleans in possession of Mrs. Chapman's car. At the time of the arrest, FBI agents made a superficial examination of the car then stored it in a garage. Two days later Lodi officers arrived to take custody of Teale. They placed the automobile in a sealed box car and shipped it to Lodi. On November 12, immediately upon its arrival in Lodi, the box car was unsealed and the automobile examined by Lodi police and a state criminalist. They had neither a search warrant nor the consent of its jailed owner, Mrs. Chapman. They took

---

[5]After the prosecution rested, Mrs. Chapman's extrajudicial statement to the Lodi police was offered in evidence by the defense and admitted in evidence over the prosecution's objection. The announced purpose of the offer was to support Mrs. Chapman's claim of amnesia and delayed recall. In connection with the offer, the defense waived constitutional objection to the statement. Possibly the waiver of objection, independently motivated and with the advice of counsel (see *People* v. *Spencer* (1967) *supra,* 66 Cal.2d at pp. 165, fn. 6, 168, fn. 8), might extend to the evidentiary product of the statement. Having eaten of the fruit of the poisonous tree, Eve should not deny Adam his bite. Also, the statement being in evidence, its revelations would affect the appraisal of prejudice emanating from their product. Our resolution of this phase of the appeal makes these inquiries unnecessary.

photographs of the automobile interior, swept up debris (such as fibers and hairs) for examination, then removed the floor mats and clothing bar, the interior dome light and the fabric roof lining. The material was then taken to the laboratory for examination. Counsel for Mrs. Chapman made a pretrial motion to suppress evidence of these items, asserting an illegal search and seizure. The motion was denied, the items admitted in evidence and made the subject of incriminating testimony. The objection is renewed on appeal.

A warrantless police search of an automobile must meet the Fourth Amendment test of reasonableness before evidence obtained as its result is admissible; reasonableness is measured in relation to the totality of the circumstances surrounding the search; the search is reasonable if it is "incidental to a lawful arrest" of the vehicle's possessor. (*Preston* v. *United States* (1964) 376 U.S. 364, 367 [11 L.Ed.2d 777, 780, 84 S.Ct. 881]; *People* v. *Williams* (1967) 67 Cal.2d 226, 229-230 [60 Cal.Rptr. 472, 430 P.2d 30].) A number of decisions place the search outside the category of those incident to the arrest where an unnecessary delay occurs between the arrest and the search (e.g., *Preston* v. *United States, supra; People* v. *Burke* (1964) 61 Cal.2d 575 [39 Cal. Rptr. 531, 394 P.2d 67]). Other decisions uphold search of the vehicle if the time lapse between arrest and search is attributable to reasonable police necessities. (*People* v. *Harris* (1967) 67 Cal.2d 866, 871 [64 Cal.Rptr. 313, 434 P.2d 609]; *People* v. *Williams, supra; People* v. *Webb* (1967) 66 Cal.2d 107, 111-112 [56 Cal.Rptr. 902, 424 P.2d 342]; *People* v. *Talbot* (1966) 64 Cal.2d 691, 708-709 [51 Cal.Rptr. 417, 414 P.2d 633].)

That the police had opportunity to procure a warrant does not invalidate the search, for " ' [t]he relevant test is not whether it is reasonable to procure a search warrant, but whether the search was reasonable.' " (*Cooper* v. *California* (1967) 386 U.S. 58, 62 [17 L.Ed.2d 730, 733, 87 S.Ct. 788], quoting from *United States* v. *Rabinowitz* (1950) 339 U.S. 56, 66 [94 L.Ed. 653, 660, 70 S.Ct. 430]; see Comment, 52 Minn. L. Rev. (1967) 533-540.)

The Attorney General supports legality of the search on the theory that the car was not mere evidence, but an instrumentality of the crime. The argument is untenable. Both the federal and California Supreme Courts have adopted the view that ". . . there is no viable reason to distinguish intrusions to secure 'mere evidence' from intrusions to secure fruits, instrumentalities, or contraband." (*Maryland Peni-*

*tentiary Warden* v. *Hayden* (1967) 387 U.S. 294, 310 [18 L.Ed.2d 782, 794, 87 S.Ct. 1642] ; *People* v. *Harris, supra,* 67 Cal.2d at p. 871; *People* v. *Thayer* (1965) 63 Cal.2d 635, 637-642 [47 Cal.Rptr. 780, 408 P.2d 108].) Whatever we might label the automobile in question, whether an instrumentality or "mere evidence," the criterion of the search's legality is its reasonableness.

■■■■ As owner of the car Mrs. Chapman doubtless has "standing" to challenge its search. (See *Wong Sun* v. *United States, supra.*) The automobile came under police control upon the arrest of Teale, its possessor, not the arrest of Mrs. Chapman, its owner. In the totality of circumstances the former event, not the latter, dominates. Under some circumstances a relatively slight separation in space and time between arrest and search may make the search unreasonable (e.g., *Preston* v. *United States, supra*; *People* v. *Burke, supra*). Here a unique set of circumstances makes the search reasonable despite a relatively wide separation in space and time. The investigative problem was to connect physical clues found at the crime scene in California with those in the automobile found in New Orleans. Laboratory comparisons were necessary. The FBI agents who made the arrest and impounded the car had neither direct responsibility nor direct involvement in the investigation, which was in the hands of the California authorities, half a continent distant. It was entirely reasonable to ship the vehicle to California for examination. The lapse of two days between Teale's arrest and shipment of the automobile from New Orleans was justified by the need to await the arrival of the Lodi officers who would simultaneously take charge of the prisoner and the automobile. Once the vehicle arrived at Lodi, there was no delay whatever, for the box car was immediately unsealed and the automobile immediately examined.

The search was made as soon after the arrest as was practicably possible. The geographic factors, the separation of responsibility between the arresting and investigating agencies and the scientific character of the investigative task impel the conclusion that there was *reasonable* contemporaneity between the arrest and the search. In the totality of the circumstances, examination of the vehicle immediately upon its coming into the hands of the investigating officers was reasonably incidental to its possessor's arrest. Having been produced by a lawful search, the evidence found in the automobile was admissible.

*Absence of Instruction on Involuntary Manslaughter*

 In the first Teale-Chapman trial the jury had been instructed on felony murder only, that is, murder committed in the perpetration of robbery. On the ensuing appeal Mrs. Chapman contended that the jury should have instructed on involuntary manslaughter, as the latter is defined in Penal Code section 192.[6] The Supreme Court rejected the contention, stating: ". . . an objective evaluation of the defendant's evidence as to her mental capacity does not permit a reasonable conclusion that she could not have acted with 'malice aforethought' (Pen. Code, § 187), and at the same time have entertained an intent to commit an 'unlawful act, not amounting to a felony' or a lawful act 'in an unlawful manner, or without due caution and circumspection.' (Pen. Code, § 192.) According to her expert witness' testimony she did not have the mental capacity to commit any crime. Hence, the jury was properly instructed that defendants were guilty of murder of the first degree or were not guilty of the unlawful commission of any homicide." (*People* v. *Teale, supra,* 63 Cal.2d at pp. 192-193.)

At Mrs. Chapman's second trial the judge instructed not only on a felony murder but on premeditated murder of the first degree, murder of the second degree and manslaughter. The trial court's instructions defined "manslaughter" as follows: "Manslaughter is the unlawful killing of a human being, without malice or [*sic*] aforethought." In effect, the court also instructed that reasonable doubt as to the degree of the crime would require selection of second rather than first degree murder and of manslaughter rather than second degree murder; instructed also on diminished capacity due to intoxication or mental illness, as it bore on the accused's ability to formulate the intent necessary to the crime of murder in its several degrees.

Thus Mrs. Chapman's first and second trials differed in that the latter included jury instructions on various kinds of homicide other than felony murder. It is in the context of

---

[6]Penal Code, section 192, provides in part:

"Manslaughter is the unlawful killing of a human being without malice. It is of three kinds:

"1. Voluntary—upon a sudden quarrel or heat of passion.

"2. Involuntary—in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection; provided that this subdivision shall not apply to acts committed in the driving of a vehicle.

"3. In the driving of a vehicle— . . . ."

these additional instructions that Mrs. Chapman again pursues her claim to an involuntary manslaughter instruction.

*People* v. *Conley* (1966) 64 Cal.2d 310, 316-318 [49 Cal. Rptr. 815, 411 P.2d 911], describes a concept of voluntary manslaughter covering unjustified killings outside the strict letter of Penal Code, section 192, where malice is negated by intoxication or mental defect. An example occurs when the jury rejects a claim of complete unconsciousness, yet finds the defendant's mental capacity so reduced as to preclude malice. (*People* v. *Conley, supra,* 64 Cal.2d at p. 319.) This kind of manslaughter is sometimes termed "nonstatutory" manslaughter. (See *People* v. *Aubrey* (1967) 253 Cal.App.2d 912, 919 [61 Cal.Rptr. 772].) Although established in relation to homicide prosecutions outside the felony-murder group, the *Conley* concept of manslaughter has been extended to felony-murder cases where, as here, the issue of diminished capacity or intoxication is raised as a defense to the felony charge as well as the murder charge. (*People* v. *Ford* (1966) 65 Cal.2d 41, 58, fn. 9 [52 Cal.Rptr. 228, 416 P.2d 132]; *People* v. *Sievers* (1967) 255 Cal.App.2d 34, 38-39 [62 Cal.Rptr. 841].) The *Conley* decision refers to this variety of manslaughter as voluntary, not involuntary. (64 Cal.2d at p. 318.)

On Mrs. Chapman's first appeal the Supreme Court had rejected the possibility of an intermediate verdict such as manslaughter, but that rejection occurred before the *Conley* decision. In view of that decision and in the light of defense claims of unconsciousness and diminished capacity, the trial judge correctly instructed the jury on voluntary manslaughter of the "nonstatutory" variety.

In claiming entitlement to an instruction on involuntary in addition to voluntary manslaughter, defendant points out that the case went to the jury not only on a felony-murder theory, but as a homicide outside the felony-murder classification. There was no evidence that Adcock's killing resulted from negligence or from the commission of an unlawful act other than a felony, thus no basis for an involuntary manslaughter instruction corresponding to subdivision 2 of Penal Code, section 192. There is, nevertheless, evidence that Mrs. Chapman was voluntarily intoxicated. In a suggested form of jury instruction for cases outside the felony-murder category, *People* v. *Conley* (64 Cal.2d at p. 326, fn.) points to the possibility of a kind of nonstatutory involuntary manslaughter, where the accused killed while unconscious as a result of

voluntary intoxication.[7] Although not developed by later case law, the *Conley* suggestion supplies a certain foothold for Mrs. Chapman's present claim. At this point we meet the fact that the defense requested no such instruction.

 In criminal cases the trial court is required to instruct on the general principles of law relevant to the issues raised by the evidence; the general principles governing the case are those closely and openly connected with the facts before the court and which are necessary for the jury's understanding of the case. (*People* v. *Wilson, supra,* 66 Cal. 2d at p. 759; *People* v. *Wade* (1959) 53 Cal.2d 322, 334 [1 Cal.Rptr. 683, 348 P.2d 116].) In *People* v. *Crawford* (1968) 259 Cal.App.2d 874 [66 Cal.Rptr. 527], we observed that overbroad appellate demands for *sua sponte* instructions tend to hamper the tactical choices of defense attorneys and put trial judges under pressure to glean legal theories and winnow the evidence for remotely tenable and sophistical instructions. They also supply defense counsel an opportunity to capitalize on invited error by failing to request an instruction thinly supported by meager evidence, then utilizing its absence as an argument for appellate reversal.

 In the present case the instruction on nonstatutory (voluntary) manslaughter answered the demand for instructions on the general principles evoked by the evidence of diminished capacity. An additional instruction on involuntary manslaughter was relatively abstruse, arguable and only distantly, if at all, suggested by the evidence. In the context of the present trial a defense request for the instruction in the trial court was a prerequisite to assigning its absence as error on appeal.

*Other Claims of Erroneous Jury Instructions.*

 Assigned as error is the trial court's rejection of a proposed instruction telling the jury that if Adcock had been killed in Sacramento County, the alleged robbery in San Joaquin County had terminated before the killing and the homicide could not be first degree murder under the felony-

---

[7]Apparently, unconsciousness attributable to causes other than voluntary intoxication would not evoke this kind of instruction, for the latter variety of unconsciousness is a complete, not a partial, defense to crime. (*People* v. *Wilson* (1967) 66 Cal.2d 749, 761 [59 Cal.Rptr. 156, 427 P.2d 820]; *People* v. *Baker* (1954) 42 Cal.2d 550, 575 [268 P.2d 705]; see 1 Witkin, Cal. Crimes (1963), §§ 145, 147.) In the present case there was testimony of "blackouts," hysteria and amnesia in addition to evidence of liquor consumption. See *People* v. *Baker, supra,* for an instance of claimed unconsciousness due to such a combination of causes.

murder doctrine. On appeal the argument is not so much that the events took place in different counties, but rather that the robbery had been completed and the killing not committed in its perpetration.

■ A robbery may be a continuing crime, spread over distance and time; the robbers' escape with the loot is as important to execution of the plan as gaining its possession; a killing committed in the course of conduct intended to facilitate escape after the robbery and as part of one continuous transaction constitutes felony murder. (*People* v. *Ketchel* (1963) 59 Cal.2d 503, 523 [30 Cal.Rptr. 538, 381 P.2d 394].)

■ The uncontradicted evidence, however circumstantial, points to a continuing, indivisible transaction, commencing with the holdup of Adcock at the bar and robbery of the bar receipts; his abduction to an isolated rural area, aimed either at gaining safety for the perpetrators or for further robbery or both; a shooting and, either before or after the shooting, looting of the victim's wallet. As pointed out *ante,* pages 165-166, felony murder does not require that the homicide be planned as part of the robbery. It made no difference that the perpetrators could not know in advance the precise course of events after they set the robbery in motion.[8] Proof of a strict causal relationship between the robbery and the homicide was unnecessary. (*People* v. *Chavez* (1951) 37 Cal.2d 656, 669 [234 P.2d 632].) Any attempt to split this continuing course of conduct into separately conceived crimes would be quite artificial. The court properly refused to instruct the jury that the robbery of Adcock had ceased before the shooting.[9]

---

[8]At this point we paraphrase *People* v. *Harrison* (1959) 176 Cal. App.2d 330, 345 [1 Cal.Rptr. 414], although that case was disapproved in another respect by *People* v. *Whitehorn* (1963) 60 Cal.2d 256, 264 [32 Cal.Rptr. 199, 383 P.2d 783].

[9]Defendant relies upon *People* v. *Ford, supra,* 65 Cal.2d at pp. 48-49, 55-57, holding that robbery followed by the victim's kidnaping were separate crimes and separately punishable, since the kidnaping followed the robbery and was not a means of perpetrating the latter; holding also, that the defendant's killing of a policeman was not committed in perpetration of the robbery, which had been committed hours earlier. The facts in *Ford* are quite distinguishable. In that case there was uncontradicted evidence of the defendant's irrationality; the kidnaping was committed not to ensure the robber's getaway, but to use the victim and his car to transport the defendant's estranged wife from an illicit menage; while the shooting of the officer had no relation to the robbery or escape from the robbery. Here, in contrast, there was a single continuing transaction, culminating in the shooting of the victim and only one victim of both alleged crimes. (See *People* v. *Modesto* (1963) 59 Cal.2d 722, 731 [31 Cal.Rptr. 225, 382 P.2d 33].)

Error is assigned in an instruction permitting the jury to decide whether the robbery had terminated before the shooting. The contention is bottomed on *People* v. *Ford, supra,* which states (65 Cal.2d at p. 56) that the trial court should have determined as a matter of law that the robbery had terminated prior to the homicide. The *Ford* statement was premised on the nonconflicting evidence in that particular case. ■ Felony-murder trials frequently feature a doubt or conflict on the issue of divisibility or continuity of the several criminal acts. When that doubt or conflict exists, the issue should be submitted to the jury. (*People* v. *Gonzales* (1967) 66 Cal.2d 482, 486 [58 Cal.Rptr. 361, 426 P.2d 929] ; *People* v. *Green* (1956) 47 Cal.2d 209, 215 [302 P.2d 307] ; cf. *People* v. *Fitzgerald* (1961) 56 Cal.2d 855, 860 [17 Cal.Rptr. 129, 366 P.2d 481] ; 1 Witkin, Cal. Crimes (1963) § 312.)

■ Evidence of Mrs. Chapman's purchase of the two pistols, of her statement as they left Croce's bar that ''We are not going to do anything here,'' and of the parties' subsequent collaboration, justified jury instructions on conspiracy,· even though conspiracy was not alleged in the accusatory pleading. (*People* v. *Teale, supra,* 63 Cal.2d at p. 188; *People* v. *Ditson* (1962) 57 Cal.2d 415, 447 [20 Cal.Rptr. 165, 369 P.2d 714].) Although the trial court did not specifically instruct the jury that conspiracy required specific intent, it did instruct on specific intent as a necessary element of robbery and felony murder, also on intoxication and unconsciousness as factors militating against specific intent. The jury instructions on the specific intent phase of the case were adequate. (See *People* v. *Seter* (1963) 216 Cal.App.2d 238, 247 [30 Cal.Rptr. 759].)

■ The court properly rejected a defense request for instructions drawn from drunk-driving cases, describing the stage at which a person comes under the influence of intoxicating liquor. Its instructions on intoxication and unconsciousness as factors bearing on Mrs. Chapman's capacity to form the specific intent to rob fully apprised the jury of the governing law. The court properly refused to burden the jury with the confusing and irrelevant instructions drawn from the vehicle cases.

■ Error is assigned in the rejection of a defense-proposed instruction telling the jury, in effect, that the prosecution was bound by the testimony of its own witness, the woman prison inmate who had related Ruth Chapman's statement that she had ''passed out'' in the rear seat of the car.

■ In a murder case the burden of going forward with proof of mitigation, justification or excuse rests upon the defense, unless these factors are shown by the prosecution's own evidence. (Pen. Code, § 1105.) Thus, in passing upon the adequacy of evidence to sustain a conviction, appellate courts have formulated the rule: " '. . . if the prosecution presents as a part of its case a statement of the defendant evidencing justification for the alleged crime, the prosecution is bound by that evidence in the absence of proof to the contrary.' " (*People* v. *Mercer* (1962) 210 Cal.App.2d 153, 158 [26 Cal. Rptr. 502], quoting from *People* v. *Griego* (1955) 136 Cal. App.2d 51, 55-56 [288 P.2d 175].)

The defense relies upon the latter notion to support its present contention. The rule appears to be a guide to judicial review, not designed for guidance of the jury. (See *People* v. *Albertson* (1944) 23 Cal.2d 550, 586-588 [145 P.2d 7].) In any event, it has force only when all the prosecution evidence points to excuse or mitigation. ■ If there is substantial evidence incompatible with the theory of excuse or mitigation, the jury may consider all the evidence and determine whether the act amounted to unlawful homicide. (*People* v. *Acosta* (1955) 45 Cal.2d 538, 541 [290 P.2d 1]; *People* v. *Mercer, supra,* 210 Cal.App.2d at p. 159.) The prosecution is not "bound" by testimony of its own witness indicating excuse where there is other prosecution evidence showing lack of it. (*People* v. *Domingo* (1962) 210 Cal.App.2d 120, 125-126 [26 Cal.Rptr. 315].)

■ Over objection, the prosecution adduced evidence of several checks which Mrs. Chapman had drawn on an empty bank account in the days preceding the robbery. Although it showed the commission of offenses other than those charged, the trial court had discretion to admit this evidence, since it was relevant to proof of motive for the robbery. (Evid. Code, § 1101, subd. (b).) Error is assigned in an instruction in which the court told the jury that the evidence was received for a limited purpose, not to prove criminality, but "for such bearing, if any. as it might have on the questions of intent or motive. . . ." A trial court may properly give a limiting instruction describing the purpose for which evidence of uncharged offenses is admitted. (*People* v. *Carson* (1966) 240 Cal.App.2d 477, 479 [49 Cal.Rptr. 653]; *People* v. *Demes* (1963) 220 Cal.App.2d 423, 439 [33 Cal.Rptr. 986]; see CALJIC 33.) The instruction was flawed because it referred to intent and motive as though these were synonymous. They

178

are not. (See 1 Witkin, Cal. Crimes (1963) § 54.) The flaw, however, was harmless.

*Evidentiary Rulings*

Defendant assails admission in evidence of the .32 automatic pistol found in Teale's possession when he was arrested in New Orleans. The pistol was relevant evidence that Mrs. Chapman and Teale shared a preconceived design to commit robbery, for it was identified as one of two pistols which she had bought while she and Teale were in Reno. Relevance of the .32 automatic was not dissipated by absence of evidence that it was actually used in the crime. (See *People v. Trout* (1960) 54 Cal.2d 576, 586 [6 Cal.Rptr. 759, 354 P.2d 231, 80 A.L.R.2d 1418].)

Error is assigned in the exclusion of a statement which Mrs. Chapman gave to the police in St. Joseph, Missouri. On appeal she contends that the statement was relevant to proof of her amnesia on the night of the crime. At the trial, however, the statement was not offered for that purpose. Dr. Sheuerman, the defense psychiatrist, had testified that he based his diagnosis of amnesia and hysteria in part upon Mrs. Chapman's transcribed statements to the police in St. Joseph and Lodi. At that point the defense offered both statements in evidence for the declared purpose of showing the jury the partial basis for Dr. Sheuerman's opinion. The court rejected the offer. Although Dr. Sheuerman testified at length, he was not asked to describe the statements which had been submitted to him or to explain their role in his diagnosis. Later in the trial the defense again sought to introduce the two statements. After extensive argument outside the jury's presence, there was a stipulation that the Lodi statement might be read to the jury. There is no record that such a stipulation was sought as to the St. Joseph statement. At no point did the defense offer the St. Joseph statement as relevant evidence of Mrs. Chapman's psychological condition on the night of the crime.

An expert witness may express an opinion based on information without regard to the information's admissibility in evidence. (Evid. Code, § 801, subd. (b); Witkin, Cal. Evidence (2d ed 1966) § 410.) Thus the doctor's use of Mrs. Chapman's St. Joseph statement did not open the door to its being read to the jury. Such a statement has limited admissibility. Current California law gives the trial court discretion to weigh its probative value as a partial basis for the expert's opinion against the risk that the jury might improperly consider it as independent proof of the facts recited

therein. (*People* v. *Modesto, supra,* 59 Cal.2d at p. 732; see Dieden and Gasparick, *Psychiatric Evidence and Full Disclosure In the Criminal Trial* (1964) 52 Cal.L.Rev. 543, 550-552.) The trial court rejected the offer. On appeal, however, the claim is not refusal to exercise discretion or abuse of it; rather, defendant now contends that the statement was admissible as independent, relevant evidence of her mental condition at the time of the crime. There are two bases for rejection of that contention: First, counsel was required to explain its materiality to the trial court in order to predicate error on its exclusion. (*People* v. *Lyons* (1958) 50 Cal.2d 245, 261 [324 P.2d 556]; *People* v. *Jones* (1960) 177 Cal.App.2d 420, 425 [2 Cal.Rptr. 305].) Second, even in its role as evidence of amnesia and hysteria, the statement was cumulative, since Dr. Sheuerman testified that she had told him of "blacking out" on the night of the crime and she herself gave courtroom testimony to the same effect.

### Multiple Punishment

When a series of connected crimes is incident to one objective, the defendant may be punished for the most serious offense but not for more than one. (Pen. Code, § 654; *Neal* v. *State of California* (1960) 55 Cal.2d 11, 19-20 [9 Cal.Rptr. 607, 357 P.2d 839].) Mrs. Chapman received separate, concurrent sentences for first degree murder and for robbery. She contends that the dual sentence violates the proscription against multiple punishment.

Whether a course of criminal conduct is divisible, giving rise to separately punishable crimes, depends upon the intent and the objective of the actor. (*Kellett* v. *Superior Court* (1966) 63 Cal.2d 822, 824-825 [48 Cal.Rptr. 366, 409 P.2d 206].) A number of decisions involve a completed armed robbery, followed by a separately motivated shooting, each of which is separately punishable (e.g., *People* v. *Massie* (1967) 66 Cal.2d 899 [59 Cal.Rptr. 733, 428 P.2d 869]; *People* v. *Birdwell* (1967) 253 Cal.App.2d 621 [61 Cal.Rptr. 536]; *People* v. *Houghton* (1963) 212 Cal.App.2d 864 [28 Cal.Rptr. 351].) Others illustrate a robbery and shooting which are incident to the single objective of robbery. (Eg., *In re Henry* (1966) 65 Cal.2d 330 [54 Cal.Rptr. 633, 420 P.2d 97]; *People* v. *Ridley* (1965) 63 Cal.2d 671 [47 Cal.Rptr. 796, 408 P.2d 124].)

In this case the jury's verdicts represent an implied finding that the killing had been committed in the perpetra-

tion of robbery. Although the jury had been instructed on premeditated murder, there was no evidence of premeditated killing on Mrs. Chapman's part. The sole basis for her conviction of first degree murder was her participation with Teale in a robbery, in the perpetration of which one or both had fired the fatal shots. This finding does not compel an identical determination of the multiple punishment inquiry, for a felony murder may occur during escape, after completion of the felony. (*People* v. *Ketchel, supra,* 59 Cal.2d at pp. 523-524; Witkin, Cal. Crimes (1963) § 312.) In a felony-murder case the inquiry into multiple punishment parallels, but not precisely, inquiry into the question whether the murder is ''committed in the perpetration'' of the felony (p. 57). (See *People* v. *Ford, supra,* 65 Cal.2d at pp. 48-49, 55-57.) Further, since sentencing is a court function, the court and not the jury must determine divisibility of the offense for sentencing purposes.

The evidence pointed to two acts of robbery upon Adcock: a taking of the bar receipts at the Spot Bar and a taking of the victim's personal funds at the scene of the shooting. The fatal shots were inextricably combined with both takings. There is no evidence that the shooting was motivated by any design or impulse independent of the double robbery. All the offenders' actions were incident to the single objective of robbery, and only one punishment, for the more serious crime, is lawful.

The robbery sentence is set aside. The judgment is affirmed in all other respects.

Pierce, P. J., and Regan, J., concurred.

A petition for a rehearing was denied May 13, 1968, and appellant's petition for a hearing by the Supreme Court was denied June 11, 1968. Mosk, J., did not participate therein.